## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.:

TEVON THOMAS,

      Plaintiff,

v.

THE CITY OF AURORA, a municipality
ROCH GRUSZECZKA, in his official and individual capacities,
JONATHAN FULLAM, in his official and individual capacities,
CASSIE LONGNECKER, in his/her official and individual capacities,

      Defendants.

_____

### PLAINTIFFS' COMPLAINT AND JURY DEMAND
_____

Plaintiff, TEVON THOMAS, by and through counsel, David Lane, Liana Orshan, and Tyrone Glover of KILLMER, LANE & NEWMAN, LLP, respectfully alleges for his Complaint and Jury Demand as follows:

### INTRODUCTION

1.      On November 10, 2018, Aurora Police Department ("APD") officers Roch Gruszeczka, Jonathan Fullam, and Cassie Longnecker unlawfully seized, searched, and arrested Plaintiff Tevon Thomas. These officers contacted Tevon Thomas and Reanna Drinkwater, who are both Black, at the Foxdale Condominium's where Mr. Thomas lives with his mother. Ms. Drinkwater had given Mr. Thomas a ride home. It was around 4 a.m. and they were sitting in Ms. Drinkwater's car talking. Unbeknownst to them, a woman who also lived in the complex called

1

911 to report that she was frightened by them sitting in their car because they "did not belong there."

2.      Consequently, Defendant APD officers contacted Mr. Thomas and Ms. Drinkwater, who explained that the two of them were just sitting and talking.  Neither Mr. Thomas nor Ms. Drinkwater posed any danger or threat to the officers or anyone else. There was no evidence of a crime afoot. There was no probable cause or reasonable suspicion that either was committing, had committed, or was going to commit any crime.  Nevertheless, APD officers forced Mr. Thomas and Ms. Drinkwater to exit the car and, with the intention of searching the vehicle, ordered Mr. Thomas to lie face down in the parking lot.  The Defendants found a gun in the vehicle.  They then handcuffed, seized, and arrested Plaintiff.

3.      On June 17, 2020, the Honorable Judge Raymond Moore of the United States District Court of Colorado found that the Defendant police officers violated plaintiff Tevon Thomas' Fourth Amendment right to be free from unreasonable search and seizure. *U.S. v. Tevon Thomas*, No. 19-cr-20-RM, Tr. Mot. Suppress Hr'g 117:11 (D. Colo. June 17, 2019) ("Tr. Mot. Suppress Hr'g").  Judge Moore found that Defendants "unlawfully extended [a valid stop] and turned [it] into an unjustified or extended stop that had, as its motivation and intention, the search of the car and/or Mr. Thomas." Tr. Mot. Hr'g 120:15. The officers' lack of any other legitimate reason for their prolonged seizure of Mr. Thomas raises the strong and reasonable inference that Mr. Thomas was unlawfully seized, unlawfully searched and unlawfully arrested simply because he was Black.

4.      Defendant officers' unconstitutional search and seizure of Mr. Thomas was done in accordance with, and occurred as a result of, Defendant Aurora's longstanding and prevalent custom of subjecting Black people to racially-biased policing and violating their Fourth

Amendment rights. This custom is ratified, endorsed, and condoned by senior officials and policymakers throughout Aurora when they fail to train officers on their constitutional obligations; when they fail to investigate and discipline officers they know have violated their citizens' civil rights; and when they ignore court-issued suppression orders identifying and explaining their officers' constitutional violations.

5.     Tthe Supreme Court remarked in *Terry v. Ohio*, suppression orders are "powerless … where the police either have no interest in prosecuting or are willing to forgo successful prosecution in the interest of serving some other goal." 392 U.S. 1, 14 (1968). In Aurora, such "other goal" is present in this case: the systemic and customary disregard for the rights of Black people to be secure in their persons.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331. This action is authorized and instituted pursuant to 42 U.S.C. § 1983.

7.     42 U.S.C. § 1988 conveys jurisdiction supporting Tevon Thomas's claims for attorney's fees and costs.

8.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391. All the events alleged occurred within the State of Colorado, and all the parties were residents of the State at the time of the events giving rise to this Complaint.

## PARTIES

9.     Plaintiff Tevon Thomas was and is a citizen of the United States and State of Colorado during the relevant times described herein.

10.     At all times relevant to the allegations of this Complaint, individual Defendants Gruszeczka, Fullam, and Longnecker were police officers for the city of Aurora.  All are citizens of the United States and residents of the State of Colorado.

11.      Defendant City of Aurora ("Aurora") is a municipality and is a proper party under § 1983.

12.     All Defendants acted under color of state law at all times relevant to this Complaint.

## FACTUAL ALLEGATIONS

13.     Around three a.m. on November 10, 2018, Reanna Drinkwater got off work and picked Tevon Thomas up in her car.  Mr. Thomas is a young Black man. Ms. Drinkwater is a young Black woman.

14.     They parked at the Foxdale Condominiums on East Alameda Parkway in Aurora where Mr. Thomas lived with his mother. Ms. Drinkwater lived nearby, making it a convenient place to continue their conversation.

15.     Around four a.m., another resident of the Foxdale Condominiums, Giorgi Martinez, who is White, was returning home and saw Mr. Thomas and Ms. Drinkwater in the parking lot. She called the police. She did not, however, ask to have Ms. Drinkwater's vehicle investigated, and explained to dispatch she was just calling the police on the advice of her parents: "I called my parents and they said I should ask if there's a cop that could escort me into the building... I'm not necessarily sure that I need a police officer to walk me home. My parents just said I should try to call." 911 Call, 11.10.2018.

16.     APD officers Roch Gruszeczka and Jonathan Fullam responded in marked police vehicles and met Ms. Martinez at a nearby gas station. There, she gave them a description of the

car and explained that it had been in the parking lot for over an hour, and that it was running. She noted that there were "two holes in the back-right door" of the car. "They look like bullet holes to me," she said, "which kind of freaked me out a little bit more." The officers offered to escort her home. She accepted their offer, recognizing "[i]t's a little ridiculous, but I appreciate it." Police Bodyworn Cameras, 11.10.2018.

17.     Accordingly, Defendants Gruszeczka and Fullam, now also accompanied by a third officer, Defendant Officer Cassie Longnecker, escorted Ms. Martinez back to her apartment. But after she was inside, the Defendants, without reasonable suspicion or probable cause and not at the request of Ms. Martinez, then drove over to and behind Ms. Drinkwater's vehicle where her and Mr. Thomas were still talking. As they approached the vehicle Defendant Officer Longnecker identified that the bullet holes, while perhaps startling to Ms. Martinez, "were old and not relevant to anything occurring that night." Police Bodyworn Cameras, 11.10.2018. Officer Fullam agreed. The three armed Defendant officers positioned their cruiser so that Ms. Drinkwater could not drive away, and blasted the driver's side of Ms. Drinkwater's car with their floodlight. Officers Fullam and Longnecker went around to the passenger's side, where Mr. Thomas was sitting. Officer Fullam shone his flashlight in Mr. Thomas's face. Officer Gruszeczka did the same on driver's side where Ms. Drinkwater was seated.

18.     Gruszeczka began questioning Mr. Thomas and Ms. Drinkwater, asking if they had been there a while and if they lived at the condominiums. Mr. Thomas responded "Yeah, on the other side," gesturing to the other side of the building where he lives with his mom. Police Bodyworn Cameras, 11.10.2018. Ms. Drinkwater explained that she lived up the street, at which point defendant Gruszeczka interrupted to ask that they turn off the car.

19.     Ms. Drinkwater calmly turned off the car, and Defendant Gruszeczka asked again, "Where do you guys live at?" Ms. Drinkwater said, "we were just talking. Why, what's the—" Officer Gruszeczka interrupted "Well, you guys are parked here so people are calling, and they said you've been out here for a while." Despite that not being illegal, Ms. Drinkwater nonetheless offered to leave and said, "I don't know. Okay. We can move." Police Bodyworn Cameras, 11.10.2018.

20.     Defendant Gruszeczka again asked, "where do you guys live at?" Ms. Drinkwater shared that she lived "up the street." When Mr. Thomas began to answer, "my mother stays—"he was interrupted by Defendant Gruszeczka, who demanded to know "honestly, where do you guys live at?" Ms. Drinkwater again said, "I live down the street." Mr. Thomas again said, "My mother stays here." Officer Gruszeczka continued to press Mr. Thomas, "In these apartments?" "Yes," Mr. Thomas stated for the third time. Police Bodyworn Cameras, 11.10.2018.

21.     Next, Officer Gruszeczka asked Mr. Thomas and Ms. Drinkwater how long they had been there, and Ms. Drinkwater told him that it had been about 30 minutes. Officer Gruszeczka then began, without articulating a reason why, to ask questions about the contents of the car. He asked if there was "anything in the car [he] should know about." When he was told that there was not, he persisted, asking "so if I look through the car, there's nothing I would find?" Ms. Drinkwater, stunned, responded "No, why would you need to look through my car?" Police Bodyworn Cameras, 11.10.2018.

22.     Neither Officer Gruszeczka nor Officers Fullam or Longnecker articulated any reason why they might be suspicious of the car's contents. They had no reasonable suspicion or probable cause, or otherwise valid reason to think that there was anything illegal in Ms. Drinkwater's vehicle, that either Ms. Drinkwater or Mr. Thomas committed or were committing

a crime, or that there valid evidence of a crime in the vehicle. Both Mr. Thomas and Ms. Drinkwater had been compliant, had identified themselves, and had explained to the officers that they lived nearby.

23.     Officer Gruszeczka, however, dismissed Mr. Thomas's statements and claimed that Mr. Thomas and Ms. Drinkwater were telling different stories; that the car had been there for a while; and that neither of them lived there. Mr. Thomas and Ms. Drinkwater were  confused as to why the Officers did not believe them. Officer Gruszeczka then asked whose car it is and requested both of their IDs, which have both Mr. Thomas and Ms. Drinkwater's addresses confirming that Mr. Thomas lives in the condominium complex and Ms. Drinkwater lives nearby. He also asked Mr. Thomas again, "Is there anything you'd like to tell me?" And he accused Mr. Thomas of "being nervous." Mr. Thomas calmly said, "It's not me being nervous." Ms. Drinkwater and Mr. Thomas both explained that they're "just confused." Police Bodyworn Cameras, 11.10.2018.

24.     Despite this obvious confusion and the lack of reasonable suspicion or probable cause to continue to contact and question Mr. Thomas and Ms. Drinkwater, officers Fullam and Longnecker did not speak up or intervene. They stood outside the passenger side door focused on Mr. Thomas.

25.     Next Officer Gruszeczka ordered Ms. Drinkwater out for further questioning eventually placing her in the back of his police SUV. He then joined officers Fullam and Longnecker on the passenger side of Ms. Drinkwater's car and ordered Mr. Thomas out of the vehicle. As Mr. Thomas complied, Officer Fullam indicated that he saw the handle of a pistol petruding from Mr. Thomas's pocket and alerted the other officers to the presence of the firearm. Police Bodyworn Cameras, 11.10.2018. Officers Gruszeczka, Fullam, and Longnecker drew

their guns and pointed them at Mr. Thomas. Officer Longnecker Ordered Mr. Thomas onto the ground where Officer Fullam handcuffed and searched Mr. Thomas. The APD officers then arrested him.

26.     On June 17, 2019, Judge Raymond Moore of the U.S. District of Colorado found that Defendants Gruszeczka, Fullam, and Longnecker did not have reasonable suspicion or probable cause to search or seize Mr. Thomas. Judge Moore in granting Mr. Thomas' Motion to Suppress "all evidence obtained as a result of being detained in violation of his Fourth Amendment rights," reasoned that the officers rationalizations for seizing Mr. Thomas were "simply untrue." Tr. Mot. Suppress Hr'g 112:19-20.

27.     Judge Moore found that the seizure, search and arrest were violative of the Fourth Amendment to the Constitution.   Officer Gruszeczka tried to get Ms. Drinkwater to admit to having something—anything—illegal in the car, resorting to coercive statements like "I'm going to find out"; "I just want to give you a chance"; and "is there anything in the care that's not yours, that I should know about?"

28.     In his suppression Order, Judge Moore, held that the stop had become unconstitutional; that it had turned from a constitutional *Terry* stop to a "an intent to search a car or find a reason to do so, based on the fact that it was occupied by someone who, although he was doing nothing, was *correctly* identifiable as associated with a gang [because he was wearing all red]." Tr. Mot. Suppress Hr'g 119:18-23;122:5-10..

29.     Judge Moore reasoned further, "it takes more than being in a gang to give a reason for extending this stop." Tr. Mot. Supress Hr'g 119:24-25. To this point, there were no signs of drugs or weapons that the officers were aware of, and Mr. Thomas and Ms. Drinkwater had sufficiently explained their presence within the bounds of the questions the officers had

bothered to ask them. Judge Moore found, in fact, Ms. Drinkwater, around this this time, also offered to leave the area, if she and Mr. Thomas were causing concern to the residents. The officers were so focused on searching the car that they ignored this offer. In the words of Judge Moore, the "reason for the presence of the car in the area had fell to the side." Tr. Mot. Supress Hr'g 120:19-20.

30.     Judge Moore held that Mr. Thomas was illegally seized and searched and ordered that  any and all evidence obtained as a result of Mr. Thomas being detained in violation of his Fourth Amendment rights be suppressed.

## INSTITUTIONAL LIABILITY OF THE CITY OF AURORA

**1.  Defendant Aurora's customs, policies, and/or practices within the APD caused the violations of Plaintiffs' Colorado state constitutional rights.**

31.     Officers Gruszeczka, Fullam, and Longnecker conducted their unlawful detention of Mr. Thomas in full compliance with Aurora's longstanding, persistent, and widespread custom of illegally seizing Black people. Mr. Thomas, amongst many others, was a victim of Aurora's deliberate indifference to the rights of Black People to be secure in their persons.

32.     Rank-and-file members of the APD regularly escalate their interactions with Black People into unreasonable seizures without any basis for suspecting them of criminality or of being a threat to themselves or others. In conjunction, APD officers regularly use race and race-based animus as motivating factors in police decisions and actions. APD officers do this in direct violation of the Fourth and Fourteenth Amendments. This custom, habit, practice, and/or policy of unconstitutional seizure and racially-biased policing is longstanding and widespread.

33.     This behavior by rank-and-file members of the APD is so widespread and flagrant, and has led to so many incidents, lawsuits, complaints, and public condemnations, that

Aurora must be aware of it in its capacity as a governing body. Nevertheless, Aurora has remained deliberately indifferent to these constitutional violations.

34.     High ranking officials and final policymakers in Aurora condone and ratify this conduct amongst APD officers. They endorse these violations of Black People' civil rights by failing to investigate and discipline the officers who commit them, instead choosing to defend them or cover up their wrongdoing.

35.     The City of Aurora further fails to supervise and train APD officers in the rights of individuals to be secure in their persons and free from such race-based decision making in law enforcement.

36.     In fact, the longstanding policies, positions, and customs of Aurora serve to diminish the severity of constitutional violations within the APD, and to, at best, undermine any attempts to prevent future constitutional violations.

37.     It is thus the longstanding, widespread, and deliberately indifferent custom, habit, practice, and/or policy of Aurora to engage in the unreasonable escalation and extension of police encounters into seizures violating the Fourth Amendment, as well as to engage in racially biased policing. This custom was the driving force behind the unconstitutional seizure of Mr. Thomas, and the cause of his damages

**2. APD's Longstanding and Pervasive Violations of African American and other Nonwhite people's Fourth and Fourteenth Amendment Rights**

38.     APD's widespread and flagrant violation of Black people's civil rights can be seen through the sheer number of incidents where, much like their encounter with Mr. Thomas, APD officers escalated an encounter with a person of color and unconstitutionally seized them, despite lacking any reasonable grounds under which to do so.

39.     For example, on August 2, 2020, APD officers detained and handcuffed Brittany

Gilliam, a Black woman, and four Black children, including her six-year-old daughter, at

gunpoint after supposedly mistakenly identifying Ms. Gilliam's car as a stolen motorcycle. APD

officers pointed guns at the children and forced them to exit the car and lie on their stomachs; the

officers handcuffed two of the children behind their backs. The officers likewise forced Ms.

Gilliam to exit the car at gunpoint, handcuffing her and placing her in the back of a patrol

vehicle. Video footage of the stop shows the children crying hysterically while surrounded by

police officers. The use of force by the officers was clearly excessive, and obviously motivated

by racial profiling.

40.     On March 1, 2020, an APD officer confronted Dr. P.J. Parmar, a person of color,

when Dr. Parmar arrived at his business. As Dr. Parmar drove up to his garage, he found an APD

officer parked on his property. Dr. Parmar stopped immediately and honked. At that point, the

officer jumped out of his car and swore at Parmar. The officer then pulled out his gun while

running toward Dr. Parmar's car. The officer pointed his gun at Dr. Parmar's head without

having any reason to believe that Dr. Parmar was committing or had committed a crime or posed

any threat to the officer or anyone else. Dr. Parmar calmly and repeatedly asked the officer to

leave his property, to which the officer repeatedly demanded—without any legal justification—

that Dr. Parmar prove that it was his property. Instead of leaving, the officer called in two other

APD officers. APD had no reasonable suspicion much less probable cause for its officers'

seizure of Dr. Parmar, which was clearly motivated by racial profiling.

41.     On August 24, 2019, Elijah McClain was listening to music, enjoying the short

walk home from the corner store with some iced tea when Aurora police officers grabbed,

tackled, and assaulted him. Officers continued to brutalize Elijah for nearly eighteen minutes—

approximately fifteen minutes of which he was handcuffed. The force that Aurora officers used against Elijah included compressing his neck and the blood flow to his brain with two consecutive carotid holds, cranking his left shoulder with an armbar hammerlock that caused it to repeatedly pop, and, even after he was handcuffed with his hands behind his back, continuing to crush him under the weight of their bodies and slamming him to ground when he arched up slightly to vomit or in response to the pain. One officer also jammed his knee into Elijah's arm for minutes on end, with the sole purpose of inflicting pain by forcefully separating Elijah's bicep and triceps muscles. All the while, the officers terrorized Elijah with additional threats that they would tase him and sic a police dog on him. As Elijah McClain lay handcuffed, in his own vomit, on the ground, under the hundreds of pounds of combined weight of Aurora Police Department officers, Aurora Fire Rescue paramedics involuntarily injected him with a massive dose of ketamine. Minutes after the injection, paramedics noticed that he was not breathing and had no pulse. Elijah McClain never regained consciousness, and he passed away a few days later.

42.     On November 21, 2018, Jamie Alberto Torres was fixing a car in his garage with friends when a neighbor complained about noises coming from the garage. APD officers came to Mr. Torres' home solely to investigate this noise complaint, and one of the officers illegally ordered Mr. Torres to exit his garage, threatening to take him to jail. Because Mr. Torres paused momentarily before complying with the illegal order, the officer grabbed Mr. Torres, wrenched his arm behind his back, picked him up, and slammed him to the ground. Even after handcuffing Mr. Torres, the officer continued to attack Mr. Torres by slamming him to the ground again and wrenching his arm behind his back multiple times. During this encounter, Mr. Torres repeatedly screamed in pain. To justify their illegal conduct, the APD officers charged Mr. Torres with resisting arrest and failure to obey a lawful order. A jury found that Mr. Torres was not guilty of

these charges at trial. The Aurora Police Department investigated its officers' use of force against Mr. Torres but, as is customary, found no wrongdoing. A lawsuit based on this incident, claiming excessive force and racial bias, among other things, is ongoing.

43.     On March 16, 2016, multiple APD officers racially profiled Omar Hassan, a Black man, and ejected him from a coffee shop simply because he is a Black man who was wearing a hoodie. The Aurora officers acted solely on the basis of Mr. Hassan's appearance; they had no reasonable grounds for suspecting that he was engaged in any criminal conduct. Aurora officers told Mr. Hassan that he had to leave the coffee shop, because Mr. Hassan's "kind of business [was] not welcome [t]here." When he questioned the directive, one officer placed her hand on her gun, non-verbally threatening Mr. Hassan with use of deadly force. Upon information and belief, Aurora did not discipline any of the involved officers for their unconstitutional actions. Aurora paid Mr. Hassan to settle his legal claims.

44.     On February 19, 2016, Aurora officers stopped and detained Darsean Kelley simply because he was a Black man who happened to be in the vicinity of a reported crime. He questioned the officers' orders and demanded to know whether or not he was being detained. Mr. Kelley complied with officers' orders but also asserted "I know my rights," just as one officer tased him in the back. The Aurora officers conducting the stop had no reason to believe that Mr. Kelley had committed any crime or was armed or dangerous. To cover up the illegal stop and the unjustified tasing, Aurora charged Mr. Kelley with failure to follow a lawful order. That charge was eventually dismissed, but Aurora found no misconduct and did not discipline any of the officers involved in this unconstitutional detention and use of excessive force. Aurora paid Mr. Kelley $110,000 to settle his legal claims prelitigation.

45.     On December 22, 2015, several APD officers assaulted OyZhana Williams, a

Black woman, who was simply visiting her boyfriend in the hospital. When Ms. Williams refused the officer's illegal order that she give him the keys to her car, the officer tackled Ms. Williams, choked her, slammed her head against the ground, and then stomped on her head. Aurora officers had no probable cause or reasonable suspicion to believe Ms. Williams had committed any crime. Yet, to cover up their excessive use of force, the officers charged Ms. Williams with a crime and arrested her. The charges were dismissed. Upon information and belief, Aurora did not discipline any of the involved officers for their unconstitutional actions. Aurora paid over $350,000 to settle Ms. Williams' claims.

46.     On November 14, 2015, two Aurora officers ordered Dwight Crews, a 60-year-old, disabled Black man, out of his home under threat of force, despite the fact that the officers had no warrant and no legal justification to effect a warrantless arrest in the home. After Mr. Crews complied, the officers forcefully threw him to the ground because he had momentarily delayed complying with their illegal commands in order to prevent his cat from getting out of his house. To cover up their unconstitutional conduct, the Aurora officers charged Mr. Crews with resisting arrest. The judge dismissed the charge halfway through Mr. Crews' trial. Upon information and belief, Aurora did not discipline the involved officers for their unconstitutional treatment of Mr. Crews. Aurora paid Mr. Crews to settle his legal claims.

47.     On June 22, 2012, when APD officers were searching for three suspects described as Caucasian, they stopped Stetson Fields, a Black man, despite having no probable cause or reasonable suspicion to do so. After Mr. Fields left the encounter, the APD officers chased him until they located him behind a bush. Although Mr. Fields complied with the officers' request to come out from the bush and did not pose any threat to the officers, the officers released a police dog to attack Mr. Fields, leaving him with injuries.

48.     On May 10, 2009, APD officers unlawfully entered the house of David Walker without a warrant, and tased Mr. Walker at least seven times without any reason or justification to do so. APD officers further hit Mr. Walker multiple times with batons and hit and kicked him. ADP's excessive force caused Mr. Walker to suffered nerve damage. At least one of the APD officers involved had an extensive history of excessive force allegations. Aurora settled an excessive force lawsuit based on the incident brought by Mr. Walker.

49.     On March 23, 2008, multiple Aurora police officers unlawfully entered the home of, and tased, Duane Williams. The officers had been called to Mr. Williams' home for a disturbance. On arrival, they unlawfully entered Mr. Williams' home without permission and ordered him to the ground. When Mr. Williams questioned why the officers were in his garage, they tased him. Aurora police tased Mr. Williams multiple times, hit him with batons, and placed him in a choke hold. Mr. Williams suffered a compound fracture to his leg that required the insertion of a permanent metal rod and screws. Mr. Williams' claims against Aurora were settled in 2010.

50.     In December 2003, APD officers shot and killed Jamaal Bonner, a young Black man, during a prostitution sting. When an Aurora SWAT team burst into his hotel room, Mr. Bonner, who was unarmed, stood up in surprise. Aurora officers tased him, causing him to go the ground face down. Though Mr. Bonner had already been effectively tased, was surrounded by Aurora police officers, and was not armed, an Aurora officer shot Mr. Bonner three times, killing him. Aurora did not discipline any of the involved officers for their unconstitutional actions. Aurora paid $610,000 to settle the family's legal claims.

51.     The existence of so many lawsuits against APD officers for the same type of unconstitutional conduct makes it clear that Aurora either knew or had constructive knowledge

of the fact that its officers were systemically violating the Fourth Amendment, and  was

deliberately indifferent to that fact.

### 3.  Aurora's Official Position of Not Respecting Suppression Orders

52.      By refusing to take seriously orders suppressing unconstitutionally acquired

evidence, Aurora has ratified and condoned longstanding and widespread violations of Black

People' rights to be secure in their persons and free from racially-biased policing.

53.      Aurora has "long taken the position that a ruling in a criminal matter to suppress

evidence, while interesting, is not the same as a finding in a civil court that [their] officers

violated the Constitution."  (*Correspondence with City of Aurora*).

54.      "Ever since its inception, the rule excluding evidence seized in violation of the

Fourth amendment has been recognized as a principal mode of discouraging lawless police

conduct." *Terry v. Ohio*, 392 U.S. 1, 12 (1968). A suppression order is not merely interesting; it

is the mechanism by which "[c]ourts which sit under our Constitution … disapprove … actions

by state agents," and thus refuse to "be made party to lawless invasions of the constitutional

rights of citizens." *Id.* at 13.

55.      Furthermore, "the central inquiry under the Fourth Amendment [is]

reasonableness under the circumstances." *Id.* at 19. This is true regardless of the context—civil

or criminal.

56.      Nevertheless, Aurora takes the position that the standard is different as between a

criminal determination and a civil determination on [unconstitutionality]—namely, the

requirements of clearly established law and the reliance upon what the officer(s) knew at the

time of the event.

57.     The Fourth Amendment reasonableness inquiry always takes into account "the facts available to the officer at the moment of the seizure…" *Terry*, 392 U.S. at 21-22. Conversely, it provides no role for an evaluation of the clearly established state of the law.

58.     Rather, an evaluation of clearly established law belongs to the qualified immunity analysis. *See Mick v. Brewer*, 76 F.3d 1127, 1134 (10th Cir. 1996). This part of the qualified immunity analysis does not bear on whether an officer in fact violated someone's constitutional rights, but rather on whether he can be held liable for doing so.

59.     Upon information and belief, Aurora indemnifies its police officers for liability they may incur as a result of committing constitutional in the course of their duty. The Aurora city attorney's office appears to have a practice of not giving credence to judicial suppression orders in its evaluations of its officers' conduct, in direct contravention of the policy considerations underlying the exclusionary rule and espoused by the Supreme Court in *Terry*. "[W]ithout [suppression orders], the constitutional guarantee against unreasonable searches and seizures [is] a mere form of words." *Terry*, 392 U.S. at 13 (internal quotations omitted).

60.     As the municipal agency responsible for Aurora's legal policy and representation, senior officials in the City Attorney's office either knew or should have known the policy considerations underlying suppression orders, as summed up the Supreme Court in *Terry*. They also knew or should have known of the myriad violations of Black People' civil rights conducted by their officers, and the lawsuits that sprung from them.

61.     To possess this knowledge yet maintain a position of devaluing suppression orders is to systemically invite, ratify, and propagate Aurora's longstanding, widespread, and deliberately indifferent custom, habit, practice, and/or policy of rejecting Black People' rights to be secure in their persons and free from racially-biased policing.

62.     Furthermore, the subjugation of suppression orders beneath civil findings communicates to APD officers that there exists a hierarchy of constitutional violations, which undermines any other training or discipline they may receive.

63.     This position of subjugating suppression orders beneath civil findings of liability was thus a moving force and proximate cause of APD Defendants' violation of Mr. Thomas's constitutional rights.

### 4.  Defendant Aurora is liable for the APD Defendants' violation of Mr. Thomas's rights.

64.     Defendant Aurora's unlawful conduct, as set forth in detail herein, amounts to a custom and widespread practice so pervasive and well-established as to constitute a custom or usage with the force of law.

65.     Through Defendant Aurora's continuous ratification of unlawful seizures and racially-biased policing against Black people, Defendant Aurora caused the Defendants' illegal conduct.

66.     Given APD's long history and widespread practice of APD officers' unconstitutional seizure of people, particularly Black People, Aurora knew of the need to provide additional or better training and supervision in this respect and made a deliberate choice to not adequately train and supervise APD officers in avoiding Fourth Amendment violations and racially-biased policing.

67.     Aurora knew or should have known that its acts or omissions in this regard were substantially certain to cause APD officers to violate individuals constitutional rights, and it consciously or deliberately chose to disregard this obvious risk of harm in adhering to its policy and custom of failing to provide additional or better training and supervision to APD officers

regarding how to avoid excessive force and racially-biased policing.

68.    Defendant Aurora was deliberately indifferent to Mr. Thomas's constitutional rights, because Aurora knew that individuals in his position would be at a substantial risk of suffering dangerous consequences from Aurora's customs, patterns, practices and/or failure to properly train and supervise its employees.

69.    Defendant Aurora could have and should have pursued reasonable methods for the training and supervising of such employees, or of disciplining them when they engaged in misconduct. Aurora intentionally chose not to do so.

70.    Even where the courts issued suppression orders that explicitly informed Aurora that its officers had violated the Fourth Amendment, it was Aurora's official position to not respect those orders. Yet the "major thrust" of a suppression order "is a deterrent one," and "the only effective deterrent to police misconduct in a criminal context." *Terry*, 392 U.S. at 12. To devalue such a deterrent is to invite police misconduct.

71.    Aurora's policy of failing to act in the face of a long history of Fourth Amendment violations, particularly against Black People, and its custom, policy, and practice in failing to properly train and supervise its employees despite such history and knowledge or constructive knowledge of such history, were thus the moving force and proximate cause of Defendants' violation of Mr. Thomas' constitutional rights.

72.    Defendant Aurora's custom, policy, and practice of encouraging, condoning, tolerating, and ratifying racially-biased policing and excessive force, as described herein, and the subsequent cover-ups of such constitutional violations, were the moving force behind, and proximate cause of, Defendants' violation of Mr. Thomas' constitutional rights.

73.    Defendant Aurora's acts or omissions caused Mr. Thomas' unconstitutional

seizure and damages.

74.     Defendant Aurora's actions, as described herein, deprived Mr. Thomas of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

### FIRST CLAIM FOR RELIEF
*42 U.S.C. § 1983 – Fourth Amendment*
*Unlawful Seizure of Person / False Arrest*
(Against All Defendants)

75.     Mr. Thomas hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

76.     At all times relevant to this Complaint, Defendants were acting under the color of law.

77.     Prior to stopping them, Defendants had no probable cause to believe that either Plaintiff Thomas or Ms. Drinkwater had committed or was committing any violation of the law.

78.     After Plaintiff Thomas and Ms. Drinkwater provided calm, sufficient answers to Defendants' questions, officers did not have probable cause, reasonable suspicion, or any other legally valid basis to believe that Plaintiff Thomas or Ms. Drinkwater either had committed or was committing any violation of the law.

79.     Defendants did not at any time have a reasonable basis for suspecting that Mr. Thomas was armed and dangerous.

80.     Defendants did not at any time have a warrant authorizing any search, seizure, and/or detention of either Mr. Thomas' body or belongings, nor did defendants possess such a warrant for Ms. Drinkwater.

81.     Defendants, acting in concert with one another, seized and detained Mr. Thomas and did not allow him to leave.

82.     During this seizure and arrest, Defendants detained Mr. Thomas against his will, despite lacking any legally valid basis for their actions.

83.     At the time when Defendants detained Mr. Thomas without probable cause and searched his person without reasonable suspicion, Mr. Thomas's Fourth Amendment right to be secure in his person from unreasonable searches and seizures was clearly established.

84.     Defendants violated Mr. Andersen's clearly established Fourth Amendment rights by engaging in an unlawful seizure that was objectively unreasonable in light of the facts and circumstances confronting them.

85.     None of the Defendant law enforcement officers took reasonable steps to protect Mr. Thomas from the objectively unlawful arrest or seizure of the other Defendant officers, despite being in a position to do so. Each is therefore liable for the damages resulting from the objectively unlawful arrest and seizure used by the others.

86.     The acts or omissions of the individual Defendants were the moving force behind, and the proximate cause of the injuries sustained by Mr. Thomas.

87.     Defendants were engaged in these acts pursuant to the formal or informal custom, policy and practice of the City of Aurora, which encourages, condones, tolerates, and ratifies the unlawful seizure of Black People by its law enforcement officers.

88.     This formal or informal custom, policy and practice of the City of Aurora is so permanent and well settled as to constitute custom by high ranking officers, the Chief of Police, and City of Aurora employees with final policymaking authority—and has been ratified by such policymakers.

89.    The acts or omissions of Defendant City of Aurora caused Mr. Thomas damages.

## SECOND CLAIM FOR RELIEF
*42 U.S.C. § 1983 – Fourth Amendment*
*Unlawful Search*
(Against All Defendants)

90.    Mr. Thomas hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

91.    At all times relevant to this Complaint, the APD Defendants were acting under the color of state law and within the course and scope of their employment.

92.    Prior to stopping Plaintiff Thomas, the APD Defendants had no probable cause to believe that either Plaintiff Thomas or Ms. Drinkwater had committed or was committing any violation of the law.

93.    After Mr. Thomas and Ms. Drinkwater provided calm, sufficient answers to the APD Defendants' questions, the officers did not have probable cause, reasonable suspicion, or any other legally valid basis to believe that Mr. Thomas or Ms. Drinkwater either had committed or was committing any violation of the law.

94.    Defendants did not at any time have a warrant authorizing any search of Mr. Thomas' body or his belongings nor did defendants possess such a warrant for Ms. Drinkwater.

95.    Defendants, acting in concert with one another, unlawfully searched Mr. Thomas.

96.    At the time when Defendants seized and searched Mr. Thomas's person without reasonable suspicion, probable cause, or any other legally valid basis to do so, Mr. Thomas's Fourth Amendment right to be secure in his person from unreasonable searches was clearly established.

97.     Defendants violated Mr. Thomas's clearly established Fourth Amendment rights by engaging in an unlawful search that was objectively unreasonable in light of the facts and circumstances confronting them.

98.     None of the Defendant law enforcement officers took reasonable steps to protect Mr. Thomas from the objectively unlawful search by the other Defendant officers, despite being in a position to do so. Each is therefore liable for the damages resulting from the objectively unlawful search by the others.

99.     The acts or omissions of the individual Defendants were the moving force behind, and the proximate cause of the injuries sustained by Mr. Thomas.

100.    Defendants were engaged in these acts pursuant to the formal or informal custom, policy and practice of the City of Aurora, which encourages, condones, tolerates, and ratifies the conducting of unlawful searches by its law enforcement officers and sheriffs.

101.    This formal or informal custom, policy and practice of the City of Aurora is so permanent and well settled as to constitute custom by high ranking officers, the Chief of Police, and City of Aurora employees with final policymaking authority— and has been ratified by such policymakers.

102.    The acts or omissions of Defendants City of Aurora caused Mr. Thomas damages.

**THIRD CLAIM FOR RELIEF**
*42 U.S.C. § 1983 – Fourteenth Amendment*
*Denial of Equal Protection*
(Against all Defendants)

103.    Plaintiffs incorporate all other paragraphs of this Complaint as if set forth herein.

104.    The APD Defendants were acting under color of state law and within the course and scope of their employment in their actions and inactions at all times relevant to this action.

105.    At the time of the complained of events, Mr. Thomas had the clearly established constitutional right to be free from racial discrimination in law enforcement by police officers and to enjoy the equal protection of the laws.

106.    Mr. Thomas's race of Black was a motivating factor in the APD Defendants' decision to improperly search and seize him, search his person, or fail to intervene in such search and seizure. Defendants acted with the intent or purpose of depriving Mr. Thomas of the equal protection and benefits of the law, and equal privileges and immunities under the law, in violation of the Fourteenth Amendment.

107.    Defendants treated Mr. Thomas less favorably—with significantly less regard for his right to be free from unreasonable seizure—than his similarly situated White counterparts, wholly or in part because of his race.

108.    The APD Defendants acted or intentionally failed to act with an intent or purpose to discriminate against Mr. Thomas based upon his race.

109.    There was no rational basis for the APD Defendants' discriminatory actions, let alone a purpose narrowly tailored to serve a compelling governmental interest.

110.    After both Plaintiff Thomas and Ms. Drinkwater calmly and sufficiently answered the APD Defendants' questions, the officers nevertheless searched and seized Plaintiff Thomas without reasonable suspicion, probable cause, or any other valid basis to believe that Mr. Thomas had committed a crime or was armed and dangerous to himself or others. The lack of any such reasonable basis for the search and seizure, along with the Aurora Police Department's long history of racially biased policing, raises the inference that the search and seizure of Mr. Thomas by Defendants' was motivated in whole or in part because of Mr. McClain's race.

111.     The Aurora Police Department's history and disproportionate disregard for the Fourth Amendment rights of Black People gives rise to an inference of discriminatory intent. The Aurora Police Department's clear pattern of disregard for the Fourth Amendment rights of Black People is unexplainable on grounds other than race.

112.     The APD Defendants intentionally, willfully, unreasonably, and wantonly seized Mr. Thomas and subjected him to a search or failed to intervene in the search and seizure of him, wholly or in part because of his race.

113.     The APD Defendants' actions were objectively unreasonable considering the facts and circumstances confronting them.

114.     The APD Defendants engaged in these actions or inactions intentionally, willfully, maliciously, and wantonly, showing deliberate indifference to and reckless disregard of Mr. Thomas's federally protected constitutional rights.

115.     Defendant Aurora failed to properly train, supervise, and/or discipline its employees regarding the constitutional requirement not to engage in racially based policing, resulting in the APD Defendants' unlawful seizure and search of Mr. Thomas, or failure to intervene therein. Defendant Aurora particularly failed to properly train, supervise, and/or discipline its employees regarding the unlawful search and seizure of Black People, and the prohibition on using race as a motivating factor in taking police actions, including searches or seizures.

116.     Defendant Aurora's inadequate training, supervision, and/or discipline resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to Defendant Aurora.

117.     Considering the duties and responsibilities of personnel of Defendant Aurora—who must police and interact with Black People regularly— and the frequency with which such law enforcement personnel will confront Black People while discharging their duties as law enforcement officers as described herein, the need for specialized training, supervision, and discipline regarding such decisions was so obvious, and the inadequacy of training and/or supervision was so likely to result in a violation of constitutional rights, such as those described herein, that Defendant Aurora is liable for its failure to properly train, supervise, and/or discipline its subordinate employees and agents.

118.     Such failure to properly train, supervise, and/or discipline was a moving force behind and proximate cause of APD Defendants' racially biased treatment of Mr. Thomas, and makes up an unconstitutional policy, procedure, custom, and/or practice.

119.     Defendant Aurora's failure to adequately train and/or supervise, as well as the failure to take appropriate disciplinary or remedial action on past instances of similar unconstitutional conduct, as described herein, was a legal and proximate cause of the illegal, racially-motivated search and seizure of Mr. Thomas.

120.     As a direct and proximate result of the city of Aurora and APD Defendants' actions, Mr. Thomas was damaged by APD Defendants' racially motivated seizure and search of his person.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Tevon Thomas respectfully requests that this Court enter judgment in his favor and against Defendants, and grant:

(a)     Appropriate declaratory and other injunctive and/or equitable relief;

(c)     Compensatory and consequential damages, including damages for emotional distress, loss of reputation, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

(d)     All economic losses on all claims allowed by law;

(e)     Punitive damages on all claims allowed by law and in an amount to be determined at trial;

(f)     Attorney's fees and the costs associated with this action, including those associated with having to defend against the false criminal charge as well as expert witness fees, on all claims allowed by law;

(g)     Pre and post-judgment interest at the lawful rate; and

(h)     Any further relief that this court deems just and proper, and any other relief as allowed by law.

**PLAINTIFF REQUESTS A TRIAL TO A JURY ON ALL ISSUES SO TRIABLE.**

Dated this 5th day of November 2020.

KILLMER, LANE & NEWMAN, LLP

*s/ David A. Lane*

_____

David A. Lane
Liana Orshan
Tyrone Glover
Killmer, Lane & Newman, LLP
1543 Champa Street, Suite 400
Denver, Colorado 80202
(303) 571-1000
dlane@kln-law.com
lorshan@kln-law.com
tglover@kln-law.com
*Attorneys for Plaintiff*