**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-03308-LTB-NYW

TEVON THOMAS,

     Plaintiff,

v.

THE CITY OF AURORA,
ROCH GRUSZECZKA, in his individual and official capacities,
JONATHAN FULLAM, in his individual and official capacities, and
CASSIE LONGNECKER, in his/her individual and official capacities,

     Defendants.

---

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

---

Magistrate Judge Nina Y. Wang

     This matter comes before this court on:

     (1)    Motion to Dismiss Plaintiff's Complaint and Jury Demand filed by Defendants Roch Gruszeczka, Jonathan Fullam, and Cassie Longnecker in their official capacities and Defendant City of Aurora (collectively, "the City") ("the City's Motion to Dismiss") [Doc. 14, filed March 1, 2021]; and

     (2)    Motion to Dismiss filed by Defendants Roch Gruszeczka, Jonathan Fullam, and Cassie Longnecker in their individual capacities (collectively, "Officer Defendants") [Doc. 15, filed March 1, 2021] ("Officer Defendants' Motion to Dismiss") (collectively with the City's Motion to Dismiss, "Motions to Dismiss" or the "Motions").[1]

---

[1] For clarity, the court will refer to the party defendants collectively as "Defendants" but will differentiate between "Officer Defendants" and "the City" where such distinction is unclear or otherwise necessary to the court's analysis.

This court considers the Motions to Dismiss pursuant to 28 U.S.C. § 636(b), the Order Referring Case dated March 2, 2021 [Doc. 16], and the Memorandum dated March 2, 2021 [Doc. 17]. The court concludes that oral argument will not materially assist in the resolution of this matter. Accordingly, upon review of the Motions, the Parties' briefing, applicable case law, and the entire case file, I respectfully **RECOMMEND** (1) the City's Motion to Dismiss [Doc. 14] be **GRANTED**; and (2) the Officer Defendants' Motion to Dismiss [Doc. 15] be **DENIED**.

## FACTUAL BACKGROUND

The following facts are drawn from the operative Amended Complaint [Doc. 51] and the court presumes they are true for the purposes of the Motions to Dismiss. Plaintiff Tevon Thomas ("Plaintiff" or "Mr. Thomas") brings this civil action against Defendants for their alleged violations of his constitutional rights when they searched, seized, and arrested him in the early morning hours of November 10, 2018 outside of the Foxdale Condominium complex, where he lives with his mother. *See generally* [Doc. 51]. That night, another resident of the Foxdale Condominiums allegedly observed a parked vehicle outside of the complex in which Mr. Thomas, seated in the passenger seat, and Reanna Drinkwater ("Ms. Drinkwater"), the driver—both of whom are Black—were talking. [*Id.* at ¶¶ 1, 15]. Per her parents' advice, the resident called 911 to request a police escort into her building. [*Id.* at ¶ 15]. The Officer Defendants responded, first escorting the caller to her unit before contacting Mr. Thomas and Ms. Drinkwater. [*Id.* at ¶ 17]. The resident provided the Officer Defendants a description of Ms. Drinkwater's vehicle, noting "that there were 'two holes in the back-right door' of the car" which resembled bullet holes. [*Id.* at ¶ 16]. Plaintiff alleges that, as the Officer Defendants approached Ms. Drinkwater's vehicle, "Officer Longnecker identified that the bullet holes … 'were old and not relevant to anything occurring that night.'" [*Id.* at ¶ 17 (citation omitted)].

Plaintiff alleges that neither he nor Ms. Drinkwater posed any danger, and there was nothing to suggest that either individual had committed, was in the process of committing, or was going to commit any crime. [*Id.* at ¶¶ 2, 22]. Nevertheless, Officer "Gruszeczka began questioning Mr. Thomas and Ms. Drinkwater, asking if they had been [parked] there a while and if they lived at the condominiums," to which Plaintiff responded, "'Yeah, on the other side,' gesturing to the other side of the building where he lives with his mom." [Doc. 51 at ¶ 18]. Plaintiff's allegations continue:

> When Mr. Thomas began to answer, "my mother stays—" he was interrupted by Defendant Gruszeczka, who demanded to know "honestly, where do you guys live at?" Ms. Drinkwater again said, "I live down the street." Mr. Thomas again said, "My mother stays here." Officer Gruszeczka continued to press Mr. Thomas, "In these apartments?" "Yes," Mr. Thomas stated for the third time.

[*Id.* at ¶ 20]. Next, Plaintiff alleges that Officer Gruszeczka "began, without articulating a reason why, to ask questions about the contents of the car" and "[w]hen he was told that there was not, he persisted, asking 'so if I look through the car, there's nothing I would find?,'" to which "Ms. Drinkwater … responded 'No, why would you need to look through my car?'" [*Id.* at ¶ 21]. Additionally, Plaintiff alleges that, in response to Officer Gruszeczka's accusation that Plaintiff was "being nervous," Plaintiff stated, "It's not me being nervous" and Plaintiff and Ms. Drinkwater further "explained that they're 'just confused.'" [*Id.* at ¶ 23]. Then, Plaintiff alleges that "Officer Gruszeczka ordered Ms. Drinkwater out for further questioning" and later "ordered Mr. Thomas out of the vehicle" as well. [*Id.* at ¶ 25]. "As Mr. Thomas complied, Officer Fullam indicated that he saw the handle of a pistol petruding [sic] from Mr. Thomas's pocket and alerted the other officers to the presence of a firearm." [*Id.*]. The Officer Defendants drew their weapons and ordered Mr. Thomas to lie face down in the parking lot. [*Id.*]. Mr. Thomas was subsequently handcuffed, searched, and arrested. [*Id.*]. Throughout the Amended Complaint, Mr. Thomas cites

to "Police Bodyworn Camera[]" ("BWC")  footage from the incident at issue in support of his allegations. *See, e.g.,* [Doc. 51 at ¶¶ 16–19, 20–21, 23, 25].

## PROCEDURAL BACKGROUND

Mr. Thomas initiated this action by filing a Complaint on November 5, 2020, asserting the following causes of action pursuant to 42 U.S.C. § 1983 and against all Defendants: (1) a Fourth Amendment unlawful seizure/false arrest claim ("Claim One") [Doc. 1 at ¶¶ 75–89]; (2) a Fourth Amendment unlawful search claim ("Claim Two") [*id.* at ¶¶ 90–102]; and (3) a Fourteenth Amendment equal protection claim ("Claim Three") [*id.* at ¶¶ 103–120].  According to Plaintiff, the Officer Defendants' unconstitutional search and seizure were the result of, and performed in accordance with, the City's widespread practice of subjecting Black people to racially biased policing and violating their Fourth and Fourteenth Amendment rights.  *See* [*id.* at ¶¶ 31–32].

On February 18, 2021, Defendants filed a Motion to Strike Allegations Based on Communications Protected Under Federal Rule of Evidence 408 ("Motion to Strike") [Doc. 12]. In the Motion to Strike, Defendants sought to strike a statement excerpted from an email between the City Attorney's Office and Plaintiff's counsel during pre-litigation settlement negotiations (the "Excerpt") contained in Paragraph 53 of the Complaint [Doc. 1], and "all allegations that rely upon the statement," including Paragraphs 52 through 74.  [Doc. 12 at 8–9].  Then, on March 1, 2021, Defendants filed the instant Motions to Dismiss.  *See* [Doc. 14 (the City's Motion to Dismiss); Doc. 15 (the Officer Defendants' Motion to Dismiss)].  On March 30, 2021, Defendants filed a Joint Motion for Stay of Proceedings Pending Ruling on Motions to Dismiss [Doc. 27], which the court denied, *see* [Doc. 44].  On July 30, 2021, the undersigned issued a Recommendation [Doc. 46] that the Motion to Strike be granted in part and denied in part, "striking only the quotation marks and attribution in Paragraph 53."  [Doc. 46 at 11].  On September 15, 2021, Judge Babcock

4

adopted the undersigned's Recommendation and ordered Plaintiff to "file an amended pleading eliminating the quotation marks and attribution in Paragraph 53." [Doc. 47]. Pursuant to Judge Babcock's Order, [*id*.], on September 22, 2021, Plaintiff filed a Notice of Amended Complaint [Doc. 48] and attached a copy of his Amended Complaint [Doc. 48-2]. On October 7, 2021, the undersigned ordered the Clerk of Court to file the Amended Complaint as a separate docket entry, [Doc. 50], and the operative Amended Complaint was so filed, *see* [Doc. 51].

On October 6, 2021, Defendants filed a Joint Notice with respect to the Amended Complaint [Doc. 49], stating that "[g]iven the minor nature of the amendments [to the Complaint], Defendants rely upon [the instant Motions to Dismiss] as their responsive pleadings to the Amended Complaint." [Doc. 49 at 2]. The City moves to dismiss Plaintiff's claims asserted against them pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. [Doc. 14]. The Officer Defendants invoke qualified immunity from suit and seek dismissal of Plaintiff's claims against them for failure to state a claim. [Doc. 15]. Because the Motions to Dismiss are ripe for Recommendation, I consider the Parties' arguments below.

## LEGAL STANDARDS

## I. Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a motion under Rule 12(b)(6), the court must "accept as true all well-pleaded factual allegations … and view these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)). A plaintiff may not rely on mere labels or conclusions, and a "formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rather, "a complaint

must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (explaining that plausibility refers "to the scope of the allegations in a complaint," and that the allegations must be sufficient to nudge a plaintiff's claim(s) "'across the line from conceivable to plausible.'" (citation omitted)).  The court must ultimately "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

## II.    Qualified Immunity

The doctrine of qualified immunity protects government officials from individual liability in the course of performing their duties so long as their conduct does not violate clearly established constitutional or statutory right*s*.  *See Washington v. Unified Gov't of Wyandotte Cty.*, 847 F.3d 1192, 1197 (10th Cir. 2017).  Once a defendant has asserted a defense of qualified immunity, the burden shifts to the plaintiff who must establish that (1) the defendant violated a right, and (2) the right was clearly established.  *Puller v. Baca*, 781 F.3d 1190, 1196 (10th Cir. 2015).  Thus, to survive a motion to dismiss under Rule 12(b)(6) "where a qualified immunity defense is implicated, the plaintiff 'must allege facts sufficient to show (assuming they are true) that the defendants plausibly violated their constitutional rights.'"  *Hale v. Duvall*, 268 F. Supp. 3d 1161, 1164 (D. Colo. 2017) (quoting *Robbins v. Okla. ex rel. Dep't of Human Servs.*, 519 F.3d 1242, 1249 (10th Cir. 2008)).  Nevertheless, "[i]n asserting a qualified immunity defense in their Rule 12(b)(6) motion, Defendants have set a higher bar for themselves." *Pittman v. City of Aurora*, No. 19-cv-01947-PAB-NRN, 2020 WL 6586659, at *3 (D. Colo. Oct. 23, 2020), *report and recommendation adopted,* No. 19-cv-01947-PAB-NRN, 2020 WL 6585841 (D. Colo. Nov. 10,

2020).  "A district court should not dismiss a complaint for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Peterson v. Jensen*, 371 F.3d 1199, 1202 (10th Cir. 2004) (internal quotations and citations omitted).  Indeed, the Tenth Circuit has recognized that raising qualified immunity at the motion to dismiss phase "subjects the defendant to a more challenging standard of review than would apply on summary judgment."  *Sayed v. Virginia*, 744 F. App'x 542, 546 (10th Cir. 2018).

As to the second prong of the qualified immunity analysis, a right is clearly established "when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains."  *Washington*, 847 F.3d at 1197 (quoting *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (internal quotation marks omitted)).

## ANALYSIS

### I.     Officer Defendants' Motion to Dismiss

#### A.     Body-Worn Camera Footage

As an initial matter, the court notes that the Officer Defendants attach to their Motion two recordings taken from Officer Gruszeczka's BWC and a third recording from Officer Fullam's BWC.  *See* [Doc. 15-1; Doc. 15-2; Doc. 15-3].  In deciding a motion under Rule 12(b)(6), the ultimate duty of the court is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed."  *Forsgren*, 478 F.3d at 1160.  Thus, ordinarily, a court is confined to the four corners of a pleading in determining a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, taking well-pleaded facts as true.  *See Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994).  Should the court receive and consider materials outside the complaint, it may

convert a Rule 12(b)(6) motion to a motion for summary judgment if the parties have notice of the changed status and the nonmovant responded by supplying its own extrinsic evidence.  *See Alexander v. Okla.*, 382 F.3d 1206, 1214 (10th Cir. 2004).

However, under Tenth Circuit precedent, a "district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941–42 (10th Cir. 2002) (citing *GFF Corp. v. Associated Wholesale Grocers, Inc.,* 130 F.3d 1381, 1384 (10th Cir. 1997)).  Here, the Officer Defendants claim that Plaintiff's Amended Complaint refers to the BWC recordings and bases factual allegations on those recordings.  *See* [Doc. 15 at 3–5].  Plaintiff contends that the BWC footage "was not incorporated by reference into the complaint nor referred to in and central to the complaint." [Doc. 34 at 6].  Plaintiff also argues that the court should "not treat the information [in the BWC footage] as true for purposes of considering the motion to dismiss." [*Id*.].  This court respectfully disagrees with Plaintiff.

The Amended Complaint does refer to—and quotes directly—the BWC footage in support for Plaintiff's claims.  For instance, Plaintiff alleges that

> Ms. Drinkwater calmly turned off the car, and Defendant Gruszeczka asked again, "Where do you guys live at?" Ms. Drinkwater said, "we were just talking. Why, what's the—" Officer Gruszeczka interrupted "Well, you guys are parked here so people are calling, and they said you've been out here for a while." Despite that not being illegal, Ms. Drinkwater nonetheless offered to leave and said, "I don't know. Okay. We can move." **Police Bodyworn Cameras, 11.10.2018**.

[Doc. 51 at ¶ 19 (emphasis added)]; *see also* [*id*. at ¶¶ 16–18, 20–21, 23, 25 (citing directly to "Police Bodyworn Cameras, 11.10.2018")].  Moreover, while Plaintiff asserts that "this [c]ourt could not treat the information [in the BWC footage] as true for the purposes of considering the motion to dismiss," [Doc. 34 at 6], the authenticity of the recordings is not in dispute; the footage shows what it shows. *Cf. Scott v. Harris*, 550 U.S. 372, 379 (2007) (in a case involving allegations

8

of excessive force in connection with a high-speed chase, the Supreme Court considered the contents of a videotape "capturing the events in question" for which there were no allegations or indications of doctoring or tampering in any way).

Accordingly, this court concludes it may consider the BWC recordings without converting the Motions to Dismiss to summary judgment motions. In so doing, the court views the video in the light most favorable to Plaintiff, except where the video "blatantly contradicts" Plaintiffs' version of events. *See Est. of Ronquillo by & through Est. of Sanchez v. City & Cty. of Denver*, No. 16-cv-01664-CMA-KMT, 2016 WL 10843787, at *2 (D. Colo. Nov. 17, 2016), *aff'd*, 720 F. App'x 434 (10th Cir. 2017) (citing *Thomas v. Durastanti*, 607 F.3d 655, 672 (10th Cir. 2010)).

### B.    Plaintiff's Fourth Amendment Claims (Claim One and Claim Two)

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures … shall not be violated." U.S. Const. amend. IV. A "seizure" for the purposes of the Fourth Amendment occurs when a government actor terminates one's freedom of movement through means intentionally applied. *See Brower v. Cty. of Inyo*, 489 U.S. 593, 596–97 (1989); *Scott*, 550 U.S. at 381. "A traffic stop is a seizure for Fourth Amendment purposes." *United States v. Valenzuela*, 494 F.3d 886, 888 (10th Cir. 2007). The "ultimate touchstone" of the Fourth Amendment is "reasonableness." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (quotations omitted). The reasonableness of a routine traffic stop is assessed under the principles laid out for investigative detentions in *Terry v. Ohio*, 392 U.S. 1 (1968), and the Tenth Circuit's analysis under *Terry* is two-fold. *See United States v. Winder*, 557 F.3d 1129, 1133 (10th Cir. 2009).

"First, [courts] ask whether an officer's stop of a vehicle was 'justified at its inception.'" *Id*. (citing *Valenzuela*, 494 F.3d at 888). "A traffic stop is justified at its inception if an officer has

(1) probable cause to believe a traffic violation has occurred, or (2) a reasonable articulable suspicion that a particular motorist has violated any of the traffic or equipment regulations of the jurisdiction." *Id.* (citing *United States v. Martinez,* 512 F.3d 1268, 1272 (10th Cir. 2008)). "Second, if a traffic stop was justified at its inception, [courts] determine whether 'the resulting detention was reasonably related in scope to the circumstances that justified the stop in the first place.'" *Id.* (quoting *Valenzuela,* 494 F.3d at 888).  Additionally, a traffic stop "implicates a passenger's Fourth Amendment interests to the same degree as the driver's." *United States v. Wilson*, 96 Fed. App'x. 640, 643 (10th Cir. 2004) (citing *United States v. Erwin,* 875 F.2d 268, 270 (10th Cir. 1989) ("[W]e reject any notion that a vehicular stop detains for Fourth Amendment purposes *only* the driver simply because the passenger may be free to depart.")).

### 1.    The Initial Stop

Here, the Parties do not dispute that the Officer Defendants' stop of Ms. Drinkwater's vehicle, in which Plaintiff was a passenger, was justified at its inception.  Indeed, Plaintiff expressly concedes this point. *See* [Doc. 34 at 9 n.1 ("Plaintiff concedes that Defendants had reasonable justification to approach Mr. Thomas and Ms. Drinkwater's vehicle to determine the reason for their presence in the parking lot.")]; *see also* [*id*. at 13 (Plaintiff's acknowledgement that "any valid reasonable suspicion that justified the stop at its inception had already long dissipated" only *after* "Defendant Gruszeczka ordered Ms. Drinkwater out of the vehicle")]. Accordingly, the court focuses on the second *Terry* factor—that is, whether the resulting detention of Plaintiff was reasonably related in scope to the circumstances that justified the stop in the first place. *See* [*id.* at 9 ("At issue in Plaintiff's complaint is the second inquiry")].

### 2.      The Investigative Detention

For purposes of constitutional analysis, a traffic stop is characterized as an investigative detention rather than a custodial arrest.  *See United States v. Chavez*, 660 F.3d 1215, 1221 (10th Cir. 2011).  "Generally, an investigative detention must last no longer than is necessary to effectuate the purpose of the stop."  *United States v. Patten*, 183 F.3d 1190, 1193 (10th Cir. 1999) (quoting *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)).  In a routine traffic stop, an officer "may request a driver's license, vehicle registration and other required papers, run necessary computer checks, and then issue any warning or citation."  *United States v. Gregoire*, 425 F.3d 872, 879 (10th Cir. 2005) (citing *United States v. Rosborough*, 366 F.3d 1145, 1148 (10th Cir. 2004)).  "Once those tasks are completed, a driver must be allowed to proceed on his way unless reasonable suspicion exists that the driver is engaged in criminal activity or the driver consents to additional questioning."  *Id.*; *see also Winder,* 557 F.3d at 1134 ("Although an officer may effect a stop once he observes conduct that leads him 'reasonably to conclude' that criminal conduct 'may be afoot,' termination of the encounter is required once the officer's suspicion is dispelled and probable cause fails to develop." (quoting *United States v. Peters*, 10 F.3d 1517, 1522 (10th Cir. 1993)).

During a *valid* investigative detention, an officer may conduct a limited protective search ("frisk") if the officer harbors an articulable and reasonable suspicion that the person is armed and dangerous.  *United States v. King*, 990 F.2d 1552, 1557 (10th Cir. 1993).  Similarly, "[o]fficers can conduct a protective search of a vehicle[] … for weapons during an investigative detention when officers have a reasonable belief that a suspect poses a danger."  *United States v. Dennison*, 410 F.3d 1203, 1210 (10th Cir. 2005).  For there to be reasonable suspicion, all that is required is that "the officer … must have a particularized and objective basis for suspecting the particular

person stopped of criminal activity." *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007) (quoting *Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000)).

The determination of reasonable suspicion "does not depend upon any one factor, but on the totality of the circumstances." *United States v. Soto*, 988 F.2d 1548, 1555 (10th Cir. 1993) (citation omitted). The evaluation of whether an officer has a "particularized and objective basis for suspecting legal wrongdoing" is made "from the perspective of the reasonable *officer*, not the reasonable person." *United States v. Quintana-Garcia*, 343 F.3d 1266, 1270 (10th Cir. 2003) (emphasis in original) (internal quotation marks omitted).

According to the Officer Defendants, "[t]he time of the stop, Plaintiff's criminal history and gang affiliation, and his refusals to cooperate" must be considered when evaluating the reasonableness of their actions. [Doc. 15 at 10]. The Officer Defendants claim that "[t]here was reasonable suspicion to contact Plaintiff and Ms. Drinkwater and ask them questions, including asking Ms. Drinkwater … to step out of the car for additional questions"; and "although Defendant Officers were beginning to ask Plaintiff additional questions, they immediately noticed a gun in Plaintiff's pocket and took reasonable steps to assure safety of everyone on the scene." [*Id*.].[2] Plaintiff argues that "any reasonable suspicion based on the reporting party's concerns that Mr. Thomas and Ms. Drinkwater 'did not belong there' was dispelled" after "Defendants [1] determined that the bullet holes in Ms. Drinkwater's vehicle's door 'were old and not relevant to

---

[2] In the Motion to Dismiss [Doc. 15], the Officer Defendants note that "Plaintiff relies heavily on a ruling made in his criminal case concerning suppression of evidence." [Doc. 15 at 10 n.2]; *see also* [Doc. 51 at ¶¶ 26–30]. The Tenth Circuit has made clear that "a conclusion during a criminal prosecution that a law enforcement officer's conduct was unconstitutional is not afforded collateral estoppel effect in a subsequent civil case against the officer because there is no privity between the prosecution in the criminal case and the officer." *Novitsky v. City of Aurora*, 491 F.3d 1244, 1252, n.2 (10th Cir. 2007) (citing *Morgan v. Gertz*, 166 F.3d 1307, 1309 (10th Cir. 1999) and *Kinslow v. Ratzlaff*, 158 F.3d 1104, 1105–07 & n. 3 (10th Cir. 1998)). Thus, Mr. Thomas "must establish anew that the officers violated his constitutional rights in this § 1983 action." *Id*.

anything occurring that night,' and [2] learned from Mr. Thomas that he lived at the condo complex with his mom, and from Ms. Drinkwater that she lived down the street."  [Doc. 34 at 10]. Moreover, Plaintiff contends that "[n]o additional reasonable suspicion arose during the encounter such that Defendants had any legitimate basis to continue interrogating Mr. Thomas and Ms. Drinkwater about their presence in the parking lot, especially to interrogate them about the contents of the car."  [*Id*.].  Therefore, Plaintiff argues, the Officer "Defendants' failure to end the encounter, and subsequent search of Mr. Thomas, violated Mr. Thomas's constitutional rights."  [*Id*.].

Based on the record before it, the court finds that Plaintiff has sufficiently alleged that the Officer Defendants lacked reasonable suspicion to prolong the stop and conduct the searches at issue.  As mentioned above, the Officer Defendants argue that "[t]he time of the stop, Plaintiff's criminal history and gang affiliation, and his refusals to cooperate" constitute "reasonable suspicion that the Defendant Officers could be dealing with an armed and dangerous [person]." [Doc. 15 at 10].  This argument is unavailing at this juncture for several reasons.

***Criminal History and Gang Affiliation.***  First, as to Plaintiff's "criminal history and gang affiliation," the Tenth Circuit has stated that "[s]tanding alone, a criminal record—let alone arrests or suspected gang affiliation—is not sufficient to create reasonable suspicion of anything." *United States v. Hammond*, 890 F.3d 901, 906–07 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 390 (2018) (quoting *United States v. Rice*, 483 F.3d 1079, 1085 (10th Cir. 2007)) (alterations omitted). Otherwise, "any person with any sort of criminal record—or even worse, a person with arrests but no convictions—could be subjected to a *Terry-type* investigative stop by a law enforcement officer at any time without the need for any other justification at all."  *United States v. Sandoval*, 29 F.3d 537, 543 (10th Cir. 1994).  "Such a rule would offend the careful balance between individual

liberty and public safety that is at the heart of the Fourth Amendment." *Hammond*, 890 F.3d at 907.

Here, the Officer Defendants argue that Plaintiff's "criminal history" supports their "reasonable suspicion that [they] could be dealing with an armed and dangerous person." [Doc. 15 at 10]. The Officer Defendants also assert that they had reasonable suspicion because "Plaintiff was wearing all red, which is identifiable as being associated with a gang," relying upon Judge Moore's findings from the suppression hearing seven months *after* the stop at issue. [Doc. 15 at 10 (citing [Doc. 1 at ¶ 28])]. However, unlike in *Hammond*, where officers knew the individual "was a gang member who had recently been arrested for weapons possession, that he was riding in the very car seized during his previous arrest, and that he was wearing gang colors," 890 F.3d at 907, here the Complaint does not allege that the Officer Defendants had such knowledge about Mr. Thomas when they investigated him, nor does the BWC demonstrate such. *See generally* [Doc. 51]. The Officer Defendants not only fail to explain *what* in Plaintiff's alleged criminal history led them to this conclusion but also *how* they could have learned about Plaintiff's alleged criminal history before they noticed the gun in Plaintiff's pocket and subsequently arrested him. *See* [Doc. 15]. This court respectfully declines to engage in fact-finding in the context of the Motion to Dismiss. *See Chapman v. Stricker*, 81 F. App'x 77, 80 (7th Cir. 2003) (finding that the district court erred when it engaged in "impermissible factfinding" to determine motion to dismiss); *see also United States v. Davis*, 94 F.3d 1465, 1468 (10th Cir. 1996) (no reasonable suspicion that an individual was engaging in criminal activity based on: (1) his car being parked outside a known criminal establishment; (2) his actions in exiting the car when he saw the officers, making and then breaking eye contact, and refusing to stop when directed; (3) his keeping his

hands in his pockets; and (4) the officers' knowledge of his prior criminal record).[3]   And to the extent that the Officer Defendants claim "they immediately noticed a gun in Plaintiff's pocket and took reasonable steps to assure the safety of everyone on the scene," [Doc. 15 at 10], absent reasonable suspicion, no further conversation was necessary.  Construing the allegations in favor of Plaintiff as this court must at this juncture, this court cannot conclude that "the resulting detention was reasonably related in scope to the circumstances that justified the stop in the first place"—that is, finding out Plaintiff's and Ms. Drinkwater's reason for sitting in Ms. Drinkwater's vehicle that morning—to justify dismissal now.  *See Winder*, 557 F.3d at 1133.

   ***Refusal to Cooperate.***  Second, the Officer Defendants simply state that Plaintiff "refus[ed] to cooperate" but fail to specify how.  *See* [Doc. 15 at 10; Doc. 43 at 4].  Conversely, in the Amended Complaint, Plaintiff alleges that Officer "Gruszeczka began questioning Mr. Thomas and Ms. Drinkwater, asking if they had been [parked] there a while and if they lived at the condominiums," to which Plaintiff responded, "'Yeah, on the other side,' gesturing to the other side of the building where he lives with his mom." [Doc. 51 a ¶ 18].  Plaintiff's allegations continue:

> When Mr. Thomas began to answer, "my mother stays—" he was interrupted by Defendant Gruszeczka, who demanded to know "honestly, where do you guys live at?" Ms. Drinkwater again said, "I live down the street." Mr. Thomas again said, "My mother stays here." Officer Gruszeczka continued to press Mr. Thomas, "In these apartments?" "Yes," Mr. Thomas stated for the third time.

---

[3] An evaluation of the BWC does not change this conclusion.  Indeed, the Officer Defendants' briefing, including the BWC footage attached thereto, suggests that they knew very little about Mr. Thomas on the morning at issue.  For instance, the officers acknowledge that, at the time of the stop, they knew Plaintiff went only by the name of "Young" and had no other information by which to identify him, see [Doc. 15 at 5 (citing [Doc. 15-2])]; Ms. Drinkwater denied that there was anything in the car that did not belong to her that she believed the officers should know about, [*id.*]; and the bullet holes on Ms. Drinkwater's car were unrelated to Plaintiff as Ms. Drinkwater explained that "her 'ex got shot,'" [*id.*].  This court cannot conclude that the BWC footage "blatantly contradicts" Plaintiff's factual allegations.  *See Est. of Ronquillo*, 2016 WL 10843787, at *2.

[*Id.* at ¶ 20].  Next, Plaintiff alleges that Officer Gruszeczka "began, without articulating a reason why, to ask questions about the contents of the car" and "[w]hen he was told that there was not, he persisted, asking 'so if I look through the car, there's nothing I would find?,'" to which "Ms. Drinkwater … responded  'No, why would you need to look through my car?'"  [*Id.* at ¶ 21]. Additionally, Plaintiff alleges that, in response to Officer Gruszeczka's accusation that Plaintiff was "being nervous," Plaintiff stated, "It's not me being nervous" and Plaintiff and Ms. Drinkwater further "explained that they're 'just confused.'"  [*Id.* at ¶ 23].  Then, Plaintiff alleges that "Officer Gruszeczka ordered Ms. Drinkwater out for further questioning" and later "ordered Mr. Thomas out of the vehicle" as well.  [*Id.* at ¶ 25].  Finally, "[a]s Mr. Thomas complied, Officer Fullam indicated that he saw the handle of a pistol petruding [sic] from Mr. Thomas's pocket and alerted the other officers to the presence of a firearm."  [*Id.*].  Again, the BWC footage that Defendants attach their Response does not contradict the foregoing version of events.  *See* [Doc. 15-1; Doc. 15-2; Doc. 15-3].

Based on the allegations in the Amended Complaint, the court is not convinced that Plaintiff "refus[ed] to cooperate" as the Officer Defendants describe, let alone that the officers' alleged perception of such "refusal" formed "a particularized and objective basis for suspecting" Plaintiff of criminal activity to merit dismissal pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  *See Cortez*, 478 F.3d at 1115.  Moreover, the Officer Defendants cannot bootstrap Ms. Drinkwater's reluctance to consent to a search to create a reasonable suspicion of criminal activity.  "If refusal of consent were a basis for reasonable suspicion, nothing would be left of Fourth Amendment protections. A motorist who consented to a search could be searched; and a motorist who refused consent could be searched, as well." *United States v. Santos*, 403 F.3d 1120, 1126 (10th Cir. 2005).  The gun found on Mr. Thomas is immaterial for similar reasons: it cannot

form the *basis* for the search because it was discovered *during* the search. *See Pittman* , 2020 WL 6586659, at *7 (finding that a knife found on the plaintiff could not "form the *basis* for the search because it was discovered *during* the search") (emphasis in original)).

   ***Time of the Stop***.   Nor does the fact that the stop happened "around 4 a.m.," [Doc. 51 at 1], affect the court's analysis.  The late hour itself does not strike the court as remarkable.  Plaintiff alleges that Ms. Drinkwater got off work "[a]round three a.m.," [Doc. 51 at ¶ 1], and the resident was returning home "[a]round four a.m." when she contacted the police, *see* [*id.* at ¶ 15]. Moreover, there are "no other facts in the totality of circumstances that would have given the time of day probative value in the reasonable-suspicion calculus." *United States v. Archuleta*, 619 F. App'x 683, 689 (10th Cir. 2015).  In *Archuleta*, the Tenth Circuit held that a driver's possession of a firearm, the fact that he was stopped at 1:25 a.m. in a "high crime area," and his criminal history were not, "either individually or in the aggregate," a proper foundation for reasonable suspicion.  *Id.* at 688.  The court finds the same here.  Once the officers determined that Plaintiff and Ms. Drinkwater lived in or around the neighborhood and the pair were having a conversation in Ms. Drinkwater's vehicle, there was no need for officer security purposes to ask Plaintiff (or Ms. Drinkwater) to step out of the car or do any protective search at all.  In short, Plaintiff has adequately alleged in the Amended Complaint that he was detained and searched without reasonable suspicion.  Thus, this court finds that Plaintiff has adequately pled a cognizable Fourth Amendment violation and dismissal is not warranted at this stage.

### 3.    Personal Participation

   Next, the Officer Defendants argue that Plaintiff has not alleged sufficient personal participation on the part of Officers Fullam and Longnecker.  *See* [Doc. 15 at 11].  "Liability under § 1983 requires personal participation in the unlawful acts."  *Beedle v. Wilson*, 422 F.3d 1059,

1072 (10th Cir. 2005) (citation omitted).  In other words, there must be an affirmative link between

the constitutional deprivation and the defendant's personal participation.  *See Gallagher v. Shelton*,

587 F.3d 1063, 1069 (10th Cir. 2009) (citing *Green v. Branson*, 108 F.3d 1296, 1302 (10th Cir.

1997)).   Notably, the failure of a law enforcement officer to intervene in another officer's

unconstitutional conduct may be sufficient to show personal participation.   *See Fogarty v.

Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008) ("An officer who fails to intervene to prevent a

fellow officer's excessive use of force may be liable under § 1983." (citation omitted)).  The Tenth

Circuit has held that it is "clearly established"

> that all law enforcement officials have an affirmative duty to intervene to protect
> the constitutional rights of citizens from infringement by other law enforcement
> officers in their presence. An officer who fails to intercede is liable for the
> preventable harm caused by the actions of the other officers where that officer
> observes or has reason to know: (1) that excessive force is being used, (2) that a
> citizen has been unjustifiably arrested, or (3) that any constitutional violation has
> been committed by a law enforcement official.  In order for liability to attach, there
> must have been a realistic opportunity to intervene to prevent the harm from
> occurring.  Whether an officer had sufficient time to intercede or was capable of
> preventing the harm being caused by another officer is an issue of fact for the jury
> unless, considering all the evidence, a reasonable jury could not possibly conclude
> otherwise.

*Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1210 (10th Cir. 2008) (quoting *Anderson v. Branen*,

17 F.3d 552, 557 (2d Cir. 1994)).

The Officer Defendants argue that, "to the extent the claims against Defendants Fullam

and Longnecker are based on a failure to intervene theory, the allegations do not support the

same[]" because (a) "[t]he Complaint and the body worn camera footage indicate that Defendants

Fullam and Longnecker were not immediately present or in a position to observe everything that

Officer Gruszeczka observed," and (b) "there is no requirement for backup officers to question the

officers who initiated a traffic stop or contact to determine whether there was a valid basis for such

stop or contact."  [Doc. 15 at 11].

18

The court first notes that the Officer Defendants' assertion that "Defendants Fullam and Longnecker were not immediately present or in a position to observe everything that Officer Gruszeczka observed," [Doc. 15 at 11; Doc. 43 at 6], does not appear to be supported by the record before the court. The BWC footage for Defendant Fullam [Doc. 15-3] shows him standing on the passenger side of Ms. Drinkwater's vehicle—where Plaintiff was seated—and shining a flashlight inside the vehicle while Officer Gruszeczka was questioning Ms. Drinkwater. *See, e.g.*, [Doc. 15-3 at 00:50 to 4:15]. Ms. Drinkwater's person is visible at various points in Defendant Fullam's BWC footage, *see, e.g.*, [*id*. at 3:18–3:22], and both Defendant Gruszeczka's and Ms. Drinkwater's voices can also be heard throughout the video.

In the Amended Complaint, Plaintiff alleges that "officers Fullam and Longnecker did not speak up or intervene. They stood outside the passenger door focused on Mr. Thomas." [Doc. 51 at ¶ 24]. The BWC footage provided by Defendants does not belie the allegations that Defendants Fullam and Longnecker were present but failed to intervene during the investigative detention, which are taken as true for the purposes of this instant Motion to Dismiss. Accordingly, this court respectfully declines to recommend dismissal on the basis of lack of personal participation on the part of Defendants Fullam and Longnecker.

### 4.    Qualified Immunity

Finally, the Officer Defendants argue that they are entitled to qualified immunity because Plaintiff fails to state a cognizable Fourth Amendment violation and because such right was not clearly established. [Doc. 15 at 13–14]. As discussed above, the burden lies with Plaintiff to demonstrate the official violated a constitutional right and that the right was clearly established at the time of the challenged conduct. *See A.M. v. Holmes*, 830 F.3d 1123, 1134 (10th Cir. 2016). If the plaintiff fails to establish either prong, then the defendant prevails on the defense. *Id.* Because

this court has already determined that Mr. Thomas has adequately pled a cognizable Fourth Amendment violation, it now turns to whether he has carried his burden to demonstrate that such right was clearly established at the time of the challenged conduct.

Plaintiff argues that "[t]he Tenth Circuit has longstanding precedent that ensures that no reasonable officer in Defendants' position could have believed their actions were lawful," citing to a series of several Tenth Circuit cases that Plaintiff contends have "almost identical facts." [Doc. 34 at 22]. For instance, Plaintiff cites *United States v. Guzman*, 864 F.2d 1512 (10th Cir. 1988) (citations omitted), *overruled on other grounds by United States v. Botero-Ospina*, 71 F.3d 783 (10th Cir. 1995)). In that case, a state police officer stopped a vehicle because the driver and a passenger in the car were not wearing their seat belts. *Guzman*, 864 F.2d at 1519. The driver produced documents that satisfied the officer as to the driver's right to operate the vehicle. *Id*. Although the officer had no reasonable suspicion of criminal activity other than a seat belt violation, he decided to conduct a further investigation and proceeded to ask the occupants a series of intrusive questions unrelated to the traffic stop. *Id*. The Tenth Circuit concluded that the officer's detention of the occupants to ask these intrusive questions was unreasonable and stated that

> [a]n officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation. When the driver has produced a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning.

*Id*. Plaintiff also cites *United States v. Walker*, where, after a justified traffic stop, the officers "decided to detain the defendant and conduct an inquiry into matters unrelated to the traffic stop." 933 F.2d 812, 815–16 (10th Cir. 1991). Citing *Guzman*, the Tenth Circuit determined the officers' seizure was unreasonable because "[t]he officer detained the defendant to ask him questions unrelated to the speeding infraction or to the defendant's right to operate the car. Thus, the

detention was not reasonably related in scope to the circumstances that justified the interference in the first place." *Id*. at 816.

Though the factual circumstances are not identical, accepting Plaintiff's well-pled facts as true as it must at this juncture, this court concludes that the contours of the Fourth Amendment's prohibition against investigative detentions are sufficiently definite that any reasonable officer in Defendants' shoes would have understood he was violating Mr. Thomas's Fourth Amendment right. *See Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (observing that "[a]n officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) (internal quotations omitted)).  Mr. Thomas alleges that Defendant Gruszeczka began to ask questions about the contents of the car without articulating a reason why.  [Doc. 51 at ¶ 21].  Plaintiff also alleges that such inquiries, as well as requesting their identification, occurred prior to any alleged visualization of a handle of a pistol.  [*Id.* at ¶¶ 23–25].  "Tenth Circuit precedent is clear that unless the officer obtains a new and independent basis for suspecting the detained individual of criminal activity, his investigation must end." *Winder*, 557 F.3d at 1135 (citation and quotation marks omitted).  At the time of the incident in November 2018, "it was clearly established that a police officer cannot effect an investigative detention without reasonable suspicion." *Lundstrom v. Romero*, 616 F.3d 1108, 1125 (10th Cir. 2010) (citation omitted).  And, as noted above, the affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence is also clearly established. *See Vondrak*, 535 F.3d at 1210 ("[G]iven [the officer's] close proximity to the initial handcuffing, and his presence immediately thereafter, the district court was correct in denying qualified immunity to [the officer] on the excessive force claim.").

Accordingly, this court respectfully **RECOMMENDS** that the Officer Defendants' Motion to Dismiss be **DENIED** as to Claims I and II based on the Fourth Amendment.

### B.    Plaintiff's Fourteenth Amendment Claim (Claim Three)

Plaintiff's Claim Three asserts a Fourteenth Amendment claim against the Officer Defendants for violating the Equal Protection Clause.  Mr. Thomas alleges his "race of Black was a motivating factor in the [Officer] Defendants' decision to improperly search and seize him, search his person, or fail to intervene in such search and seizure."  [Doc. 51 at ¶ 106].

In *Whren v. United States*, the Supreme Court held that claims asserting selective enforcement of a law on the basis of race are properly brought under the Equal Protection Clause. 517 U.S. 806, 813 (1996).  The fundamental guarantee of the Equal Protection Clause is that "all persons similarly situated shall be treated alike."  *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985) (citation omitted).  To adequately plead an equal protection claim, Mr. Thomas must allege facts that the Officer Defendants treated him differently from others similarly situated.  *See id.*  "Individuals are 'similarly situated' only if they are alike 'in all relevant respects.'"  *Requena v. Roberts*, 893 F.3d 1195, 1210 (10th Cir. 2018) (quoting *Coal. for Equal Rights, Inc. v. Ritter*, 517 F.3d 1195, 1199 (10th Cir. 2008)).  Moreover, because Mr. Thomas's claim is essentially a claim of racially selective law enforcement, he must demonstrate that the Officer Defendants' actions "had a discriminatory effect and were motivated by a discriminatory purpose."  *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1168 (10th Cir. 2003) (citation omitted).  "The discriminatory purpose need not be the only purpose, but it must be a motivating factor in the decision."  *Id.*  "[T]here need not be direct evidence of discriminatory purpose; discriminatory purpose can be shown with purely circumstantial evidence."  *Blackwell v. Strain*, 496 F. App'x 836, 844 (10th Cir. 2012) (citations omitted).  For instance, "a police officer's pattern

of traffic stops and arrests, his questions and statements to the person involved, and other relevant circumstances may support an inference of discriminatory purpose" in the proper context. *Marshall*, 345 F.3d at 1168.

### 1.    Prior Incidents of Misconduct/Statistical Evidence

In the Amended Complaint, Plaintiff describes other cases in which Aurora Police Department ("APD") officers allegedly engaged in misconduct and claims that the APD has a "long history of racially biased policing" which "raises the inference that the search and seizure of Mr. Thomas by Defendants' [sic] was motivated in whole or in part" by Plaintiff's race.  [Doc. 51 at ¶ 110]; *see also* [*id*. at ¶¶ 38–51].

Although statistical evidence can be used to show selective law enforcement practices, *see Marshall*, 345 F.3d at 1168, such evidence "alone is rarely enough to show discriminatory purpose." *Blackwell*, 496 F. App'x at 840.  The reason is that, to prove an Equal Protection Clause claim, a plaintiff "must prove that the decisionmakers in *his* case acted with discriminatory purpose.'" *Id.* (emphasis in original) (quoting *McCleskey v. Kemp,* 481 U.S. 279, 292 (1987)). "Cases where statistical evidence tend to show intent to discriminate are rare and accepted only in certain limited contexts." *Handy v. Fisher*, No. 18-cv-00789-RBJ-SKC, 2019 WL 1375677, at *4 (D. Colo. Mar. 27, 2019) (citing *McCleskey,* 481 U.S. at 293 n.12).  "Generally, statistical data is helpful only where there is an appropriate basis for comparison." *Id.*  (citing *Blackwell*, 496 F. App'x at 842–43 (quoting *United States v. Olvis*, 97 F.3d 739, 745 (4th Cir. 1996) ("Without an appropriate basis for comparison, raw data … proves nothing."))).

The Officer Defendants argue that the other instances of alleged police misconduct cited by Plaintiff "do not supply further insight into the motivation of the November 10, 2018[] incident involving Plaintiff" because those other instances are not alleged to have involved any of the

Officer Defendants; the Amended Complaint does not include allegations concerning any of the Officer Defendants' prior traffic stops; and "[m]ere awareness of race is not sufficient to allege racial animus." [Doc. 15 at 12–13]. In his Response [Doc. 34], Plaintiff counters that evidence of the APD's "racist policing would allow the jury to plausibly connect Defendants' treatment of Mr. Thomas in this case with APD's ingrained adverse treatment of Black people and detainees." [Doc. 34 at 20]. These allegations, Plaintiff contends, "thus raise a permissible inference both that race was a motivating factor in Defendants' actions against Mr. Thomas and also that the conduct had a discriminatory effect: they show that APD's seizure decisions 'bear[] more heavily' on Black individuals than their Caucasian counterparts, and that such pattern partially explain Defendants' actions here." [*Id*. at 20–21 (citation omitted) (alterations in original)].

I find that Plaintiff's evidence of prior incidents of misconduct by the APD is insufficient to state an Equal Protection Clause claim. This is because Plaintiff's Amended Complaint has no appropriate basis for comparison. For example, the information sheds no light on the practices of the individual Officer Defendants and how often they stop Black drivers versus non-Black drivers or drivers of other races or ethnicities. Moreover, the information does not provide any information as to how often, for example, these officers stop vehicles around 4:00 a.m., or how often they ask the passenger of a parked car for identification. In short, the prior incidents referenced by Plaintiff do not address the practices of Officers Gruszeczka, Fullam, and Longnecker to suggest that Mr. Thomas's race motivated the Officer Defendants to act the way they did on the morning in question. *See Handy*, 2019 WL 1375677, at *4 (granting dismissal of the plaintiff's complaint and finding the plaintiffs' statistical evidence "insufficient to state an Equal Protection Clause Claim" where the complaint had "no appropriate basis for comparison," including that "the information shed[] no light on the practices of the individual deputies and how

24

often they stop black drivers versus nonblack drivers or drivers of other races or ethnicities," and "the information [did not] provide any information as to how often, for example, the[] officers stop vehicles after midnight or how often they ask the passenger of a parked car for identification"); *see also Blackwell*, 496 F. App'x at 841.[4]

## 2. Discriminatory Animus

Plaintiff's Equal Protection Claim, however, does not rest entirely on his proffered evidence of prior incidents of misconduct.  Rather, Plaintiff alleges that "[t]he lack of any … reasonable basis for the search and seizure, *along with* the Aurora Police Department's long history of racially biased policing, raises the inference that the search and seizure of Mr. Thomas by Defendants[] was motivated in whole or in part" by Plaintiff's race.  [Doc. 51 at ¶ 110 (emphasis

---

[4] In *Handy*, Judge Jackson explained the following with respect to *Blackwell*: "For example, in *Blackwell*, the plaintiff brought an Equal Protection Clause claim, alleging that he was stopped, detained, and subjected to heightened inspections at the New Mexico port of entry ('POE') because he is Black."  *Handy*, 2019 WL 1375677, at *4 n.1. (citing *Blackwell*, 496 F. App'x at 837).  To prove his case, he alleged the following facts:

> law enforcement activities at the POE produce "race[] based differentials in outcomes"; his "data tends to show that vehicles operated by Black truckers are subjected to inspections or searches at a much higher rate than vehicles operated by non-Black truckers"; his data "tends to show that when MTD personnel cannot tell the ethnicity of a driver prior to instigating law enforcement activity, the percentage of Black truckers subjected to enforcement activity closely corresponds to the percentage of Black truckers on the road"; there is "a significant disparity between the percentage of Black truckers reporting delays due to inspections and searches (51.7%) and the percentage of other truckers reporting delays (28.3%)"; and "30.6% of the arrests by Officer Strain at the POE are Blacks, even though Black truckers make up only 14.6% of the truckers passing through the POE.

*Id*. (citing *Blackwell*, 496 F. App'x at 841).  Judge Jackson pointed out that "even this statistical evidence was not enough because the statistical data concerned the actions of officers at the POE as a whole, rather than the conduct of the individual defendant that stopped the plaintiff."  *Id*. (citation omitted).  "Thus, the Tenth Circuit held that the plaintiff failed to show that the defendant was motivated by a discriminatory purpose."  *Id.* (citation omitted).

added)].  Additionally, in his Response, Mr. Thomas points to the court's opinion in *Pittman*.  *See* [Doc. 34 at 25–26].  The *Pittman* court concluded that the plaintiff, a Black man who was purportedly stopped by the APD for a defective headlight, stated a plausible equal protection claim where he alleged that he was "detained and searched due to his race"; and "rather than letting [the plaintiff] leave" after verifying his driver's license, registration, and insurance were valid, the officers "demanded that [the plaintiff] get out of the vehicle due to his gang associations" and searched him and the car.  2020 WL 6586659, at *9.

At this early stage of litigation, drawing all inferences in favor of Plaintiff, the court finds that Mr. Thomas has adequately stated a Fourteenth Amendment claim against the Officer Defendants.  Similar to the plaintiff in *Pittman*, Mr. Thomas has adequately alleged that the Officer Defendants lacked reasonable suspicion to prolong the stop and conduct the questioning and searches at issue.  As explained above, the Officer Defendants' argument that Mr. Thomas's "criminal history and gang affiliation" established "reasonable suspicion that [they] could be dealing with an armed and dangerous [person]," [Doc. 15 at 10], ignores the fact that—based on the allegations in the Amended Complaint and the arguments in the Motions to Dismiss—the Officer Defendants could not have known about Plaintiff's alleged "criminal history and gang affiliation" *before* ordering him out of his vehicle and seeing a gun.  *See, e.g.*, [Doc. 51 at ¶¶ 23–25].  Additionally, Plaintiff and Ms. Drinkwater informed the Officer Defendants that they resided in or around the condominium complex and were having a private conversation in Ms. Drinkwater's vehicle.  *See* [*id.* at ¶ 14].  Plaintiff alleges that after he and Ms. Drinkwater answered the Officer Defendants' questions, "the officers nevertheless searched and seized Plaintiff without reasonable suspicion, probable cause, or any other valid basis to believe that Mr. Thomas had committed a crime or was armed and dangerous to himself or others."  [*Id.* at ¶ 110].  Accepting

these allegations as true, Plaintiff plausibly alleges that the Officer Defendants' bases for prolonging the detention were pretextual. *See Marshall*, 345 F.3d at 1169 (plaintiff's testimony that he did not commit a traffic violation, if accepted as true, was evidence that the officer's initial decision to pull the plaintiff over was pretextual). The court thus finds that Plaintiff's Amended Complaint sufficiently states an Equal Protection claim under the Fourteenth Amendment such that dismissal would be inappropriate on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).[5]

Accordingly, this court respectfully **RECOMMENDS** that the Officer Defendants' Motion to Dismiss be **DENIED** as to Claim III based on the Fourteenth Amendment.

## II.    The City's Motion to Dismiss

The court will next address the City's Motion to Dismiss directed at Mr. Thomas's municipal liability claims and the claims against the Officer Defendants in their official capacities. [Doc. 14]. The City advances three arguments in their motion. First, the City argues that all claims should be dismissed against the City because "the Complaint does not sufficiently allege claims to overcome the threshold issue of a constitutional violation by the [Officer] Defendants." [Doc. 14 at 2–3]. Second, the City asserts that the claims against the Officer Defendants in their official capacities should be dismissed because naming both the City of Aurora and the Officer Defendants in their official capacities is redundant. [*Id*. at 3–4]. Third, the City argues that the

---

[5] The Officer Defendants do not appear to raise a separate qualified immunity argument with respect to Claim III alleging violations of the Fourteenth Amendment's Equal Protection Clause, as they only refer to the Fourth Amendment. *See* [Doc. 15 at 13–14; Doc. 43 at 8]. Thus, this court does not consider whether the alleged Equal Protection violation under the Fourteenth Amendment is clearly established. *See Sayed v. Lt. Page Virginia*, No. 16-cv-2712-WJM-MJW, 2017 WL 5248048, at *4 (D. Colo. Nov. 13, 2017), *aff'd in part, appeal dismissed in part sub nom. Sayed v. Virginia*, 744 F. App'x 542 (10th Cir. 2018) (holding that it would not consider a qualified immunity argument that defendants had not sufficiently developed at the motion to dismiss phase).

claims against the City should be dismissed because the Complaint fails to adequately allege facts to support municipal liability.  [*Id*. at 4–14].  Each of these arguments is addressed in turn.

## A.      Official Capacity Claims Against Officer Defendants

The court begins with the City's arguments that the official capacity claims against the Officer Defendants and against the City of Aurora are redundant.  [*Id*. at 3–4].  The Tenth Circuit has held that "a section 1983 suit against a municipality and a suit against a municipal official acting in his or her official capacity are the same."  *Stuart v. Jackson*, 24 F. App'x. 943, 956 (10th Cir. 2001) (internal quotations omitted) (quoting *Myers v. Okla. Cty. Bd. of Cty. Comm'rs*, 151 F.3d 1313, 1316 n.2 (10th Cir. 1998)).  Accordingly, where a plaintiff sues both the municipality and municipal official in an official capacity under the same theory of recovery, courts have dismissed the official capacity claim as "duplicative" or "redundant" of the claim against the municipal entity. *See Leadholm v. City of Commerce City*, No. 16-cv-02786-MEH, 2017 WL 1862313, at *5 (D. Colo. May 9, 2017).   Mr. Thomas does not address, and thus implicitly concedes, this argument in his Response.   *See generally* [Doc. 33].   Thus, I respectfully **RECOMMEND** that the official capacity claims against the Officer Defendants be **DISMISSED** as redundant.

## B.      Municipal Liability Against the City of Aurora

"To establish municipal liability under § 1983, Plaintiff must prove a constitutional violation by the individual officers.  In other words, 'absent a constitutional violation by the individual police officers whose conduct directly caused plaintiffs' injuries, there can be no municipal liability.'" *Est. of Ronquillo by and through Est. of Sanchez v. City and County of Denver*, 720 Fed. Appx. 434, 441 (10th Cir. 2017) (quoting *Trigalet v. City of Tulsa*, 239 F.3d 1150, 1156 (10th Cir. 2001)).   As discussed above, this court finds that Mr. Thomas asserts

cognizable Fourth and Fourteenth Amendment claims against the Officer Defendants; accordingly, it respectfully declines to recommend dismissal based on the City's argument that "[i]t is therefore unnecessary to reach the issue of whether there are allegations to support *Monell* liability as there has not been an adequate showing of a constitutional violation by any individual from which municipal liability might stem."  [Doc. 14 at 3].

In addition to plausibly alleging that the Officer Defendants committed a constitutional violation, Mr. Thomas must also allege sufficient facts to demonstrate that a municipal policy or custom was the moving force behind the constitutional deprivation.  *Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004).  A municipal policy or custom can take the form of

> (1) a formal regulation or policy statement; (2) an informal custom amoun[ting] to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (internal quotations and citations omitted).   In the Amended Complaint, Mr. Thomas alleges (1) that the City maintains a "longstanding, persistent, and widespread custom of illegally seizing Black people," including that "[r]ank-and-file members of the APD regularly escalate their interactions with Black People into unreasonable seizures without any basis for suspecting them of criminality or of being a threat to themselves or others" and "regularly use race and race-based animus as motivating factors in police decisions and actions," [Doc. 51 at ¶¶ 31–32]; (2)   that "[h]igh ranking officials and final policymakers in Aurora condone and ratify this conduct amongst APD officers," [*id*. at ¶ 34]; and (3) that the City fails to adequately supervise and train its officers "in the rights of individuals to

be secure in their persons and free from … race-based decision making in law enforcement," [*id.* at ¶ 34–35].

As addressed below, the court finds that Plaintiff has not adequately alleged municipal liability under any of his proffered theories, i.e., that the City has an informal policy or custom of unlawfully searching and seizing African Americans based on their race; that the City's official ratified any of the Officer Defendants' conduct; or that the City deliberately ignored the risk that its failure to train, supervise, or discipline its officers would result in constitutional violations.

***Custom or Practice.***  To establish municipal liability on the basis of custom or practice, a plaintiff must show: (1) the existence of a continuing, persistent and widespread practice of unconstitutional misconduct by the municipality's employees; (2) deliberate indifference to or tacit approval of such misconduct by the municipality's policymaking officials after notice to the officials of that particular misconduct; and (3) that the plaintiff was injured by virtue of the unconstitutional acts pursuant to the custom and that the custom was the moving force behind the unconstitutional acts.  *See Gates v. Unified Sch. Dist. No. 449*, 996 F.2d 1035, 1041 (10th Cir. 1993). "In attempting to prove the existence of such a continuing, persistent and widespread custom, plaintiffs most commonly offer evidence suggesting that similarly situated individuals were mistreated by the municipality in a similar way." *Carney v. City & Cty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008) (quotations omitted). While "no set number [of examples] is required, [] the more unique the misconduct is, and the more similar the incidents are to one another, the smaller the required number will be to render the alleged policy plausible."  *Arakji v. Hess,* No. 15-cv-00681-CMA, 2015 WL 7755975, at *6 (D. Colo. Dec. 2, 2015) (internal quotations omitted) (quoting *Griego v. City of Albuquerque*, 2015 WL 1906087, 100 F. Supp. 3d 1192, *16 (D.N.M. 2015)).

In the Amended Complaint, Mr. Thomas alleges that "APD's widespread and flagrant violation of Black people's civil rights can be seen through the sheer number of incidents where … APD officers escalated an encounter with a person of color and unconstitutionally seized them, despite lacking any reasonable grounds under which to do so," [Doc. 51 at ¶ 38], and then cites to twelve such alleged prior incidents that occurred between 2003 and 2020, [*id*. at ¶¶ 39–50].   The City argues that Plaintiff fails to allege facts to support a claim for municipal liability based on custom or practice because (1) the past incidents of APD misconduct cited in the Amended Complaint "involve claims that settled prior to trial, were dismissed prior to any finding of liability, are ongoing, or have unknown resolutions"; (2) the "number of incidents compared to the total number of police responses in the seventeen-year period between the alleged incidents is insufficient to demonstrate a custom or practice"; and (3) the past incidents "are factually and legally distinguishable from Plaintiff's claims."   [Doc. 14 at 8].   As to their third argument, Defendants explain that "[o]f the twelve allegations, nine are related to allegations of excessive force, which is not alleged by Plaintiff in this case" and only one allegation, Paragraph 39 of the Amended Complaint, "is even remotely factually similar to Plaintiff's claims, involving individuals in a vehicle."   [*Id*. at 8–9]; *see also* [Doc. 51 at ¶ 39 (alleging that "APD officers detained and handcuffed" and Black woman "at gun point after supposedly mistakenly identifying [her] car as a stolen motorcycle," and describing the circumstances of that arrest)].   In his Response, Plaintiff counters that his allegations of APD's past misconduct are sufficient to state a claim against the City, including that "[i]n response to at least six of those [incidents], Aurora condoned the *use of force* and failed to adequately investigate or discipline the officers involved" and, in all twelve instances, "Aurora officers unconstitutionally seized persons of color."   *See* [Doc. 33 at 5–6 (emphasis added)].

Even accepting the allegations in the Amended Complaint as true, this court concludes that the Plaintiff fails to sufficiently state a claim for municipal liability under a custom or practice theory.  As an initial matter, the court respectfully rejects Defendants' suggestion that resolutions of the prior claims before formal findings of liability precludes them from being evidence of a policy or custom; and notes that the disposition of the prior incidents is not relevant at this juncture. *See Est. of Valverde by and through Padilla v. Dodge*, No. 16-cv-1703-MSK-MEH, 2017 WL 3530282, at *4 (D. Colo. Aug. 17, 2017) ("The outcome of any of the alleged lawsuits is not relevant to the issue at hand.").  Similarly, this court is not persuaded by the City's second argument that Plaintiff fails to state a cognizable claim because the "number of incidents compared to the total number of police responses in the seventeen-year period between the alleged incidents is insufficient to demonstrate a custom or practice."  [Doc. 14 at 8].

Nevertheless, the court finds Defendants' third argument persuasive—that is, the prior incidents contained in the Amended Complaint as evidence of a custom or practice are distinguishable from Plaintiff's claims.  *See* [*id*. at 8–9].  Although Plaintiff acknowledges that he needs to show similar instances of misconduct to state a cognizable claim for municipal liability, *see* [Doc. 33 at 5], the prior incidents referenced by Plaintiff do not address the practices of Officers Gruszeczka, Fullam, and Longnecker to suggest that the City had a custom or practice to overlook the conduct of these particular officers.  Instead, Plaintiff alleges generally that the Officer Defendants acted "pursuant to the formal or informal custom, policy and practice of the City of Aurora, which encourages, condones, tolerates, and ratifies the unlawful seizure of Black People by its law enforcement officers."  [Doc. 51 at ¶ 87].

For the most part, the allegations of the 12 incidents Mr. Thomas references—two of which occurred more than ten years before Plaintiff's arrest and four of which occurred thereafter, *see*

[Doc. 51 at ¶¶ 39–42, 49–50]—reflect circumstances that are dissimilar to Plaintiff's.  Most crucially, Plaintiff contends it is sufficient that, in setting forth the prior incidents in the Amended Complaint, he alleges that "Aurora officers 'escalated an encounter with a person of color and unconstitutionally seized them, despite lacking any reasonable grounds under which to do so,'" [Doc. 33 at 5 (quoting [Doc. 1 at ¶¶ 38–50])], including that "[i]n response to at least six of those [incidents], Aurora condoned the *use of force* and failed to adequately investigate or discipline the officers involved," [*id.* (emphasis added)].  But Mr. Thomas does not assert a claim for excessive force against any of the Officer Defendants.  *See generally* [Doc. 51].

Plaintiff's allegations do not include any specific examples where APD officers had reasonable justification to initiate a stop but then prolonged it beyond the "scope [of] the circumstances which justified the interference in the first place," *see Winder*, 557 F.3d at 1133— the inquiry which Plaintiff acknowledges is "[a]t issue in Plaintiff's complaint," *see* [Doc. 34 at 8–9].  And Plaintiff's contention that it is sufficient that the 12 incidents referenced in the Amended Complaint involve "Aurora officers unconstitutionally seiz[ing] persons of color," [Doc. 33 at 5], is far too general and unpersuasive.  Moreover, Plaintiff's reliance on this court's opinion in *Arakji* is misplaced.  *See* [*id.* at 5–6].  In *Arakji*, Judge Arguello found that the plaintiff had sufficiently pled a municipal liability claim under a policy or custom theory where the plaintiff claimed that numerous police officers "persistently harassed him while he slept in his car," and in support of this claim "allege[d], with a high degree of factual specificity, incidents on twelve occasions within a one-year period" that happened directly to the plaintiff.  2015 WL 7755975, at *6.  Unlike *Arakji*, Mr. Thomas references prior incidents of alleged misconduct by the APD that did not involve him or, more notably, the same specific constitutional violation that Mr. Thomas is alleging.  Taking

Plaintiff's allegations as true, the court finds that Plaintiff has not sufficiently pled a plausible claim under a custom or policy theory.

*Ratification.*  Plaintiff claims that "[t]his formal or informal custom, policy and practice of the City of Aurora is so permanent and well settled as to constitute custom by high ranking officers, the Chief of Police, and City of Aurora employees with final policymaking authority—and has been ratified by such policymakers."  [Doc. 51 at ¶ 88].   A municipality may also be liable under § 1983 if it ratifies an employee's unconstitutional conduct.  *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127 (1988); *Moss v. Kopp*, 559 F.3d 1155, 1169 (10th Cir. 2009).  For that claim to withstand dismissal, a plaintiff must sufficiently allege that the "subordinate's position is subject to review by the municipality's authorized policymakers, ... [and that] the authorized policymakers approve[d] a subordinate's decision and the basis for it."  *Melton v. City of Okla. City,* 879 F.2d 706, 724 (10th Cir. 1989) (quoting *Praprotnik,* 485 U.S. at 127), *modified on other grounds,* 928 F.2d 920, 922 (10th Cir. 1991) (en banc) (explicitly leaving panel's judgment on § 1983 liability intact).

In the Amended Complaint, Plaintiff alleges that "Aurora has long taken the position that a ruling in a criminal matter to suppress evidence is not the same as a finding in a civil court that their officers violated the Constitution."  [Doc. 51 at ¶ 53].  "By refusing to take seriously orders suppressing unconstitutionally acquired evidence," Plaintiff alleges, "Aurora has ratified and condoned longstanding and widespread violations of Black People' rights to be secure in their persons and free from racially-biased policing."  [*Id*. at ¶ 52].  Relatedly, Plaintiff alleges that "[t]he Aurora [C]ity [A]ttorney's office appears to have a practice of not giving credence to judicial suppression orders in its evaluations of its officers' conduct," and, "[a]s the municipal agency responsible for Aurora's legal policy and representation, senior officials in the City Attorney's

office either knew or should have known the policy considerations underlying suppression orders." [*Id.* at ¶¶ 59–60].

In the City's Motion to Dismiss, Defendants argue that "Plaintiff's ratification claim relies upon a statement made by counsel for Defendant City during the course of protected settlement discussions." [Doc. 14 at 12 (citing [Doc. 1 at ¶ 53])]. According to Defendants, the subject statement (1) "is inadmissible under Federal Rule of Evidence 408 and should be stricken from the Complaint, along with all conclusions that rely upon the statement"; and (2) is "irrelevant as to the existence of a municipal liability claim" because the (a) Amended Complaint "contains no allegations that the City Attorney's Office" or its members are policymakers for the City, and (b) in any event, it "could not contain such allegations because the City Attorney's Office and its members are not policymakers for the Aurora Police Department." [*Id*. at 12–14].

In response, Plaintiff argues (1) that "Aurora did not terminate, or even discipline, the involved officers for violating Mr. Thomas' rights" and "instead affirmatively chose to take no remedial action whatsoever and give its imprimatur to the [Officer] Defendants' conduct, and even to conclude the [Officer] Defendants acted consistent[ly] with Aurora's customs, policies, and practices," [Doc. 33 at 15]; and (2) "Plaintiff's Complaint alleges that the Aurora City Attorney's Office takes the position 'that a ruling in a criminal matter to suppress evidence…is not the same as a finding in civil court,' which ignores Defendants' constitutional violations and plausibly raises an inference that Aurora has a pattern and practice of ignoring such violations, which directly caused" Plaintiff injury, [*id*.].

I conclude that Plaintiff fails to allege a cognizable claim that the City ratified the Officer Defendants' conduct.[6]  First, Plaintiff does not allege that anyone affirmatively approved of the Officer Defendants' conduct here.  This omission is problematic.  *See Twitchell v. Hutton*, No. 10-cv-01939-WYD-KMT, 2011 WL 318827, at *5 (D. Colo. Jan. 28, 2011) ("I find that Plaintiff's Complaint fails to allege any facts regarding an affirmative approval of Hutton's actions, which is required in order to establish municipal liability under § 1983 under a ratification theory." (citing *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189 (10th Cir. 2010)); *see also Moss*, 559 F.3d at 1169 (finding the plaintiffs did not state a claim against a city in part because it did not allege that city's policymaker approved the alleged unconstitutional conduct); *Bryson,* 627 F.3d at 790 ("[A] municipality will not be found liable under a ratification theory unless a final decisionmaker ratifies an employee's specific unconstitutional actions, as well as the basis for these actions.").  Instead, Plaintiff argues that "Aurora did not terminate, or even discipline, the involved officers for violating Mr. Thomas's rights" and "affirmatively chose to take no remedial action … and … conclude[d] the [Officer] Defendants acted consistent[ly] with Aurora's customs, policies, and practices." [Doc. 33 at 15].  But "mere acquiescence in a single discretionary decision by a subordinate is not sufficient to show ratification."  *Boudette v. Buffington*, No. 18-cv-02420-CMA-MEH, 2020 WL 6119521, at *11 (D. Colo. Feb. 21, 2020) (citing *Feliciano v. City of Cleveland*, 988 F.2d 649, 656 (6th Cir. 1993)), *report and recommendation adopted*, No. 18-cv-02420-CMA-MEH, 2020 WL 4593220 (D. Colo. Aug. 11, 2020).

Additionally, Plaintiff does not challenge Defendants' arguments that the Amended Complaint "contains no allegations that the City Attorney's Office is a policymaker for the City,"

---

[6] With respect to Plaintiff's first argument regarding the inadmissibility of the statement in Paragraph 53 under Federal Rule of Evidence 408, the court notes that this argument has already been addressed by the court, *see* [Doc. 46], and will not be addressed again here.

and the Amended "Complaint could not contain such allegations because the City Attorney's Office and its members are not policymakers for the Aurora Police Department." *See* [Doc. 14 at 13]. Rather, Plaintiff contends that the Amended Complaint alleges "that the Aurora City Attorney's Office takes the position 'that a ruling in a criminal matter to suppress evidence … is not the same as a finding in civil court,' which ignores Defendants' constitutional violations and plausibly raises an inference that Aurora has a pattern and practice of ignoring such violations, which directly caused the constitutional injury Plaintiff suffered." [Doc. 33 at 15]. While "[t]he substance of the City Attorney's characterization of the City's policy with respect to the settlement of civil rights claims (or any additional allegations related thereto) is not clearly immaterial to this case," [Doc. 46 at 9], Plaintiff does not allege facts sufficient for a factfinder to conclude the City Attorney is a policymaker for the APD, or even if a policymaker, that the City Attorney ratified the Officer Defendants' conduct vis-à-vis Mr. Thomas. Nor does Plaintiff identify another specific individual who ratified the conduct; instead Plaintiff refers to "Aurora." *See* [Doc. 51 at ¶¶ 52–53, 56, 59–61, 64–74]. But the City can only be liable under this theory if its authorized policymakers approved the conduct at issue. *See, e.g., Moss,* 559 F.3d at 1169; *see also Bryson,* 627 F.3d at 790 ("[A] municipality will not be found liable under a ratification theory unless a final decisionmaker ratifies an employee's specific unconstitutional actions, as well as the basis for these actions."). Thus, referring to "Aurora" is inadequate. *See Sexton v. City of Colorado Springs*, No. 20-cv-00108-PAB-KMT, 2021 WL 1210375, at *17 (D. Colo. Mar. 31, 2021) (finding the ratification theory insufficient where the plaintiff's allegations referred "to the City of Colorado Springs generally"). Finally, even assuming that the City's "refusing to take seriously orders suppressing unconstitutionally acquired evidence," [Doc. 51 at ¶ 52], constitutes the "acceptance" that *Praprotnik* contemplates, the Amended Complaint is still deficient because

Plaintiff does not allege that the *basis* for the Officer Defendants' conduct was also approved. *See Rehberg v. City of Pueblo*, No. 10-cv-00261-LTB-KLM, 2012 WL 1326575, at *6 (D. Colo. Apr. 17, 2012) (finding the plaintiff's allegations that a city "fail[ed] to adequately document its law enforcement officers' unconstitutional conduct" and "fail[ed] to sustain a complaint of excessive force, false[] arrest, or unlawful entry in the past 5.5. years" were "still wanting because [the plaintiff] [did] not allege that the *basis* for [the individual officers'] conduct was also approved"). For these reasons, the allegations that Mr. Thomas proffers in support of ratification fail to "nudge[]" the claim "across the line from conceivable to plausible." *Robbins v. Okla.,* 519 F.3d 1242, 1247 (10th Cir. 2008).

*Training, Supervision, and Discipline.* In the City's Motion to Dismiss, Defendants argue that the Amended Complaint "makes only conclusory allegations regarding the alleged failure to train. It does not point to any specific deficiency in the City's 'overall training,' but rather alleges facts that may suggest 'shortcomings in individual officers' training and supervision.'" [Doc. 14 at 10; Doc. 42 at 4]. In his Response, Plaintiff asserts that "Aurora officers knew, based on Aurora's lack of supervision or discipline for constitutional violations, that they had extraordinarily wide latitude … in deciding whether to contact someone simply because they were a Black man sitting in a car at night—and/or also whether to order this person out of their vehicle where the officers had no reasonable suspicion or probable cause to believe that a crime was being committed." [Doc. 33 at 13–14]. Additionally, Plaintiff contends that, related to his ratification theory, "Aurora's policy of not respecting suppression orders further reinforces that Aurora condones these longstanding and widespread violations." [*Id*. at 14]. Therefore, Plaintiff argues, "[w]hen all plausible inferences are drawn in Plaintiff's favor, it follows that the constitutional

harms would have been avoided had the Individual Defendants been supervised or known that they would be subject to discipline should they violate the Constitution."  [*Id.*].

A municipality may be liable for failing to train or supervise its employees in "limited circumstances."  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387 (1989).  The failures to "train" or "supervise" are so similar that they are discussed together and require the same elements.  *See, e.g., Bryson,* 627 F.3d at 788; *Brammer-Hoelter,* 602 F.3d at 1189–90.  In fact, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011); *see also Okla. City v. Tuttle,* 471 U.S. 808, 822–23 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training' is 'far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*.").  To state a § 1983 claim based on the failure to train or supervise, a plaintiff must sufficiently allege that the failure "amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *City of Canton,* 489 U.S. at 388.  Only then "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983."  *Id.* at 389.  "Deliberate indifference" is an exacting standard of fault.  *See Bryan Cty. Bd. of Comm'rs v. Brown,* 520 U.S. 397, 410 (1997).  It requires showing that a municipal actor disregarded a known or obvious consequence of his action.  *Id.*  "Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program."  *Connick*, 563 U.S. at 61.  "Deliberate indifference" for purposes of failure to train or supervise ordinarily necessitates showing a pattern of similar constitutional violations by untrained employees.  *See Bryan Cty.,* 520 U.S. at 409.

In the Amended Complaint, Plaintiff alleges generally that "[t]he City of Aurora … fails to supervise and train APD officers in the rights of individuals to be secure in their persons and free from such race-based decision making in law enforcement."  [Doc. 51 at ¶ 35].  Plaintiff also alleges that "[g]iven APD's long history and widespread practice of APD officers' unconstitutional seizure of people, particularly Black People, Aurora knew of the need to provide additional or better training and supervision in this respect and made a deliberate choice to not adequately train and supervise APD officers in avoiding Fourth Amendment violations and racially-biased policing." [Doc. 51 at ¶ 66].  Moreover, Plaintiff alleges that the City "knew or should have known that its acts or omissions in this regard were substantially certain to cause APD officers to violate individuals['] constitutional rights, and it consciously or deliberately chose to disregard this obvious risk of harm in adhering to its policy and custom of failing to provide additional or better training and supervision to APD officers regarding how to avoid … racially-biased policing." [*Id.* at ¶ 67].  Specifically, Plaintiff alleges that the City was on notice that its acts or omissions were likely to cause constitutional rights violations, and disregarded this risk, based on the allegation that the Aurora City Attorney's Office "refus[es] to take seriously orders suppressing unconstitutionally acquired evidence." [*Id.* at ¶¶ 52–63].  Plaintiff alleges that "the subjugation of suppression orders beneath civil findings … undermines any other training or discipline the[] [officers] may receive." [*Id.* at ¶ 62].  These general allegations fail to sufficiently state a municipal liability claim under a failure to train, supervise, or discipline theory.

First, Plaintiff makes broad references to the training he claims the APD has failed to provide—for example, training regarding "race-based decision making in law enforcement," [Doc. 51 at ¶ 35], and "officers' unconstitutional seizure of people" and "Fourth Amendment violations and racially-biased policing," [*id.* at ¶ 66].  Plaintiff does not, however, proffer any specific facts

40

regarding the officers' training or supervision—for instance, "how the individual defendants were trained, who they were trained by, why their training was deficient, or what the City's training includes and how it has changed since the alleged pattern began in [2003]." *Cook v. Whyde*, No. 20-cv-02912-PAB-STV, 2021 WL 4459051, at *16 (D. Colo. Sept. 29, 2021) (citing *Bark v. Chacon*, No. 10-cv-01570-WYD-MJW, 2011 WL 1884691, at *3 (D. Colo. May 18, 2011)). This alone is fatal to plaintiff's failure-to-train claim. *See Connick*, 563 U.S. at 61 (notice of particular deficiencies in a training program is the crux of a failure-to-train theory).

Instead, Plaintiff simply asserts that APD has a "policy and custom of failing to provide additional or better training and supervision to APD officers regarding how to avoid excessive force and racially-biased policing." [Doc. 51 at ¶ 67 (emphasis added)]. Further, of the 12 prior incidents identified by Plaintiff in the Complaint, Plaintiff alleges that five of those instances involved officers unlawfully detaining Black men or women and the City never disciplined employees for their conduct. *See* [Doc. 51 at ¶¶ 43–46, 50]. However, four of those instances involved excessive force or a shooting, [*id*. at ¶¶ 44–46, 50], which, as noted throughout this Recommendation, is not at issue in this action. And the fifth instance involved officers allegedly ejecting an individual from a coffee shop and one officer who "placed her hand on her gun, non-verbally threatening [the individual] with use of deadly force." [*Id*. at ¶ 43]. None of these instances supports Plaintiff's failure-to-train claim. *See Est. of Lobato by & through Montoya v. Correct Care Sols., LLC*, No. 15-cv-02718-PAB-STV, 2017 WL 1197295, at *8 (D. Colo. Mar. 31, 2017) (*citing Coffey v. United States*, 2011 WL 6013611, at *33 (D.N.M. Nov. 28, 2011) (noting that "the incidents [supporting a failure-to-train claim] must also be sufficiently similar to put officials on notice of the situation")). Accordingly, the court finds that Plaintiff has not sufficiently stated a claim that the City deliberately ignored the risk to its failure to train, supervise,

or discipline its officers would result in constitutional violations. *See Rehberg*, 2012 WL 1326575, at *5 (dismissing *Monell* claim where plaintiff had failed to allege specific facts regarding the officers' training and did not identify individuals that allegedly failed to adequately supervise or train); *Chacon*, 2011 WL 1884691, at *3 (dismissing municipal liability claim where plaintiff had "generally allege[d]" that the individual defendants were not properly trained but had not "allege[d] specific deficiencies in training and supervision, or explain how the incident described in the Amended Complaint could have been avoided with different or better training and supervision").

For the reasons set forth herein, I respectfully **RECOMMEND** that the City's Motion to Dismiss be **GRANTED** as to Plaintiff's municipal liability claims.

## CONCLUSION

For the foregoing reasons, this court respectfully **RECOMMENDS** that:

(1)    Motion to Dismiss Plaintiff's Complaint and Jury Demand filed by Defendants Roch Gruszeczka, Jonathan Fullam, and Cassie Longnecker in their official capacities and Defendant City of Aurora [Doc. 14] be **GRANTED**;

(2)    Claims I-III of the Amended Complaint be **DISMISSED without prejudice** as to Defendants Roch Gruszeczka, Jonathan Fullam, and Cassie Longnecker in their official capacities and Defendant City of Aurora; and

(3)    Motion to Dismiss filed by Defendants Roch Gruszeczka, Jonathan Fullam, and Cassie Longnecker in their individual capacities [Doc. 15] be **DENIED**. [7]

---

[7] Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the District Court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Property Known As 2121 East 30th Street, Tulsa, Oklahoma*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the District Judge of the Magistrate Judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district

DATED:  December 7, 2021                    BY THE COURT:

                                            Nina Y. Wang
                                            United States Magistrate Judge

---

court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (District Court's decision to review a Magistrate Judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *International Surplus Lines Insurance Co. v. Wyoming Coal Refining Systems, Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the Magistrate Judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the Magistrate Judge's ruling). *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).